UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
SAMANTHA DEJESUS,

                                  **Civil Action No.: 7:23-cv-00806 (VB)**

                  Plaintiff,           **AMENDED COMPLAINT**

        -against-

                                    *Jury Trial Demanded*

BON SECOURS COMMUNITY HOSPITAL,
and LYN WESSELS,

                  Defendants.
---------------------------------------------------------X

      PLAINTIFF SAMANTHA DEJESUS, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

      1.     This is civil action brought on behalf of Plaintiff Samantha DeJesus, against Defendant Bon Secours Community Hospital and Defendant Lyn Wessels for retaliation and interference with Plaintiff's rights under the Family and Medical Leave Act; for gender, pregnancy, and disability discrimination and retaliation in violation of the New York State Human Rights Law; for equal pay violations of the New York State Equal Pay Act, N.Y. Labor Law § 194, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

      2.     This Court has jurisdiction over Plaintiff's claims under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").

3.     The Court has supplemental jurisdiction over Plaintiff's state and city law claims, specifically the New York State Human Rights Law, NYS Executive Law § 296, *et seq.* ("NYSHRL") or ("New York State Human Rights Law"), and the New York State Equal Pay Act, N.Y. Labor Law § 194 ("YLL") pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

<u>**PARTIES**</u>

5.     Plaintiff Samantha DeJesus ("Plaintiff") is a female citizen of the United States who currently resides in Pike County, Pennsylvania.

6.     Plaintiff is Hispanic.

7.     Plaintiff was, at all times relevant, Defendants' "employee" within the meaning of all relevant federal, New York State and local laws, including, but not limited to the FMLA and NYSHRL.

8.     Upon information and belief, at all times relevant, Defendant Bon Secours Community Hospital ("Defendant Bon Secours") was and is a domestic not-for-profit corporation incorporated under the laws of the State of New York. Upon information and belief, Defendant has several locations across New York, South Carolina and Virginia.

9.     At all times relevant, Plaintiff worked out of Defendant Bon Secours location at 160 E. Main Street, Port Jervis, New York 12771.

10.     Defendant Bon Secours was, at all times relevant to the Charge, Plaintiff's "employer" within the meaning of all relevant federal, state and local laws, including, but not limited to the FMLA, NYLL, and NYSHRL.

11.     Upon and information and belief, at all times relevant, Defendant Lyn Wessels ("Defendant Wessels") was a supervisor at Defendant Bon Secours. As Plaintiff's direct supervisor, Defendant Wessels had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

12.     In addition to Defendants' direct liability under Federal Law, discriminatory actions of individuals who held supervisory responsibilities over Plaintiff, as alleged herein create vicarious liability against Defendant Bon Secours under Federal, state, and local laws.

## FACTUAL BACKGROUND

### Plaintiff is Hired by Bon Secours

13.     On or around June 19, 2017, Plaintiff was hired by Defendant Bon Secours.

14.     Plaintiff was hired at a rate of $17.00 per hour as an Authorization Specialist. Plaintiff's job duties included obtaining insurance authorizations, new, old and not-yet-authorized admits, calling insurance companies and sending faxes.

15.     Plaintiff was the only person of color working in the office, all her coworkers were white.

16.     On information and belief, Plaintiff's coworker, Authorization Specialist John Doe ("Specialist Doe"), a gay male employee, was hired on the same day at $18.00 per hour, despite having the same experience and background in the field as Plaintiff.

17.     On information and belief, Plaintiff's straight, white, non-Hispanic coworkers made $21.00-$25.00 per hour.

18.     Throughout her employment, Plaintiff excelled in her position and received positive feedback for her work.

19.     Plaintiff's immediate supervisor was Defendant Wessels, the Director of Case Management at Defendant Bon Secours.

3

**Plaintiff Gives Notice of her Need for Maternity Leave**

20.     In February 2019, Plaintiff told Defendant Wessels that she was pregnant and would need maternity leave.

21.     In response, Defendant Wessels, clearly unhappy, responded, "OK." Plaintiff was shocked and alarmed that Defendant Wessels did not even say congratulations.

22.     Defendant Wessels referred Plaintiff to the Human Resources department ("HR").

23.     HR referred Plaintiff to Prudential Insurance, who handled Defendants' maternity leave. Ultimately Plaintiff learned that she was entitled to six weeks of Short-Term Disability leave ("STD") and an additional ten weeks under the New York State Paid Family Leave, which coincided with FMLA leave.

**Defendants Call A Team Meeting and Blame Plaintiff For Ruining Everyone's Vacation**

24.     After Plaintiff informed Defendants of her upcoming pregnancy leave, Defendant Wessels, Plaintiff's co-worker, Specialist Carly Paganetti ("Specialist Paganetti") and her Supervisor, Team Leader Kelly Bullock ("Team Leader Bullock"), none of whom were pregnant or recently pregnant during all of Plaintiff's employment, began to ignore and ostracize Plaintiff, which they had not done before.

25.     Upon information and belief, they purposefully created such a hostile environment in the hopes that Plaintiff would quit.

26.     The only employee within Plaintiff's department who did not ignore her was Specialist Doe.

27.     When Defendant Wessels, Specialist Paganetti, and Team Leader Bullock began to ignore Plaintiff, because the office was so small, their disdain for her and her pregnancy was extremely noticeable and unavoidable.

28.     Defendant Wessels immediately began to discuss vacation schedules with Specialist Paganetti and Team Leader Bullock, who were all openly upset that they would have to arrange their vacations around Plaintiff's pregnancy leave and regularly made comments about how Plaintiff had ruined everyone else's vacations.

29.     The hostility grew and grew and was so open and obvious that whenever Defendant Wessels entered the small, shared office space, she would greet everyone in the room except for Plaintiff.

30.     On information and belief, Defendant Wessels, Specialist Paganetti, and Team Leader Bullock all spoke behind Plaintiff's back about how upset they were that she had become pregnant and that she would need leave at the end of summer.

31.     Plaintiff, Specialist Doe, and Specialist Paganetti all performed the same functions and job duties during Plaintiff's employment with Defendants.

32.     Team Leader Bullock also performed largely the same functions and job duties as Plaintiff, except with slightly more of a supervisory role.

**Plaintiff Takes Leave**

33.     On August 29, 2019, Plaintiff gave birth to her son.

34.     Plaintiff was out for 10 weeks of leave after having her son, but decided to return early because she was scared of losing her job.

35.     In early November 2019, Plaintiff reached out to Defendant Wessels to let her know that she would be returning to work but would use the remaining amount of her leave as intermittent leave.

**Defendants are Angered by Plaintiff's Attempt to Use Intermittent Leave**

36.     Defendant Wessels objected to Plaintiff using intermittent leave and told Plaintiff that she would have to verify that Plaintiff was entitled to use intermittent leave.

37.     On information and belief, Defendant Wessels was angry that Plaintiff wanted to use intermittent leave and attempted to prevent Charing Party from using the leave to which she was entitled.

38.     After Defendant Wessels failed to get back to Plaintiff about her intermittent leave, on or around the end of November 2019, Plaintiff gave Defendant Wessels her contact at Prudential, the insurance carrier who handled medical leave for Defendant, who had originally told Plaintiff how much leave she would receive.

39.     On information and belief, Prudential informed Defendant Wessels directly that Plaintiff was entitled to a total of six weeks of STD leave and ten weeks of Paid Family Leave, for a total of 16 weeks of leave, which she could also use intermittently.

40.     Defendant Wessels was forced to accept that Plaintiff was entitled to intermittent leave.

41.     In early November 2019, Plaintiff returned to work and intended to use the remainder of her leave intermittently.

**Defendants Denies Plaintiff Time Off Because She Took Leave**

42.     In or around mid-December 2019, Defendant Wessels held a meeting with Plaintiff and told Plaintiff that she was worried that Plaintiff would "abuse" her time off with her 16 weeks out, even though Defendant's insurance carrier had confirmed that Plaintiff was entitled to that time.  Defendant Wessels was clearly telling Plaintiff that taking the full 16 weeks off was not acceptable.

43.     Plaintiff reminded Defendant Wessels that she was just trying to take the time off to which she was entitled to care for her new child. Plaintiff stated, "This is the specific reason the "[maternity leave] law was made."

44.     Defendant Wessels, clearly outraged,  responded by rolling her eyes at Plaintiff and changing the subject.

45.     Plaintiff was able to take her 16 weeks despite Defendant Wessels attempts to subvert her leave, but it was clear that she despised her for doing so.

46.     In retaliation for her taking her maternity leave, Defendant Wessels regularly denied Plaintiff holiday and vacation days.

47.     On information and belief, Defendant Wessels went out of her way to make sure that Plaintiff could not use the other days to which she was entitled, including accrued time off, because she had used her full maternity leave.

### Plaintiff's Co-workers Ostracize Her

48.     During this time, a co-worker told Plaintiff that other co-workers, Specialist Paganetti and Team Leader, continued to complain to Defendant Wessels that they did not think it was fair that they had to cover for Plaintiff while she took intermittent leave just because Plaintiff decided to have children and they had decided not to have children.

49.     On information and belief, Team Leader Bullock even went to a friend she had in the HR department to secretly confirm that Plaintiff was entitled to the time she was taking off, despite having Defendant Wessels confirm it.

50.     Upon Plaintiff's return, Specialist Paganetti, whose desk was directly behind Plaintiff, turned her back to Charging Part whenever she would try and discuss a work related matter, which happened frequently as the two needed to communicate for both positions.

51.     Specialist Paganetti's actions made it difficult for Plaintiff to complete her tasks.

52.     Upon Plaintiff's return to work, Defendant Wessels, Specialist Paganetti and Team Leader Bullock ignored her throughout the workday.

53.     On information and belief, Specialist Paganetti and Team Leader Bullock felt comfortable complaining to Defendant Wessels because she had originally encouraged their discriminatory attitude towards Plaintiff and her use of maternity leave.

54.     On information and belief, Defendant Wessels encouraged Specialist Paganetti and Team Leader Bullock to discriminate against Plaintiff by blaming Plaintiff for interference with their vacation schedules.

55.     Even though many of Plaintiff's co-workers were retaliating against her, Plaintiff had one co-worker who, on information and belief, would defend her to Defendant Wessels, Authorization Specialist Doe.

56.     In addition to ignoring Plaintiff, Defendant Wessels would openly praise Specialist Paganetti's work and ignore any accomplishments Plaintiff made, including when Plaintiff would cover Team Leader Bullock's work while she was out of the office.

57.     Over the next several months, Plaintiff continued to suffer from the hostile work environment created by Defendants as her colleagues and direct supervisor continued to complaint about Plaintiff's use of intermittent leave behind her back and ignore her while they were at work together.

**Defendant Bon Secours Mandates Work From Home Due TO COVID-19**

58.     In April 2020, Defendant Bon Secours told all employees within Plaintiff's department that they needed to work remotely due to COVID-19.

59.     Plaintiff and her co-workers were easily able to complete their jobs from home. She was able to call insurance companies from her cell phone, and fax relevant information directly from her computer.

60.     During this time, Plaintiff was still using intermittent leave.

**Plaintiff Complains About Disparate Pay**

61.     On or about May 2020, all employees, including Plaintiff, returned to the office following working from home due to COVID-19.

62.     Upon their return, Charging Party and Specialist Doe discussed their wages and Charging Party found out that they were making less than their straight, non-pregnant, non-Hispanic coworkers.

63.     Charging Party also confirmed that she was being paid less than Specialist Doe, even though they were performing the same work and had similar experience.

64.     On information and belief, Specialist Doe made $18.00 per hour, Specialist Paganetti made $21.00 per hour, and Team Leader Bullock made $25.00 per hour.

65.     Plaintiff and Specialist Doe complained to Defendant Wessels about being underpaid compared to their coworkers for doing the same work.

66.     Defendant Wessels responded that she would look into the issue with Human Resources.

67.     On information and belief, after Plaintiff and Specialist Doe's complaint, Defendant Wessels discussed the issue with Team Leader Bullock.

68.     Shockingly, Defendant Wessels angrily came back to Plaintiff and told her, "You don't need more money since you can afford to take your children to the water park." Defendant

Wessels told her to take up her pay issued with her union, The National Healthcare Workers' Union, 1199 ("the Union" or "1199").

69.     Plaintiff was greatly insulted by that remark, because as the only woman of color in the office and the only one to have just had a baby, she was also the only one paid so little and the fact that she could take her children to the water park had no effect on the fact she was underpaid.

70.     Plaintiff and Specialist Doe approached the Union and had a meeting with Human Resources and a representative from Defendant Bon Secours' finance department about the pay disparity.

71.     During the interview, Defendant Bon Secours' representative told Plaintiff and Specialist Doe their positions paid $20.00 per hour, and did not even seem to know that they were both paid less than that.

72.     Defendant Bon Secours' finance department representative condescendingly told Plaintiff that she should be appreciative for their compensation rate.

73.     During the meeting Plaintiff and Specialist Doe pointed out that even Defendant Wessels assistant, who was hired after them, was making $20.00, more than either of them.

74.     Ultimately, the next day, Plaintiff and Specialist Doe were told via text message that their pay would be brought up to $20.00 per hour.

75.     Plaintiff had been receiving less than her co-workers, including her male co-worker, for equal work for almost three years at this point.

76.     Defendants made no effort to compensate Plaintiff for her lost compensation due to disparate pay.

**Defendant Wessels Retaliates Against Plaintiff and Specialist Doe for Seeking Equal Pay
with Unwarranted Reprimands**

77.     After their return from working remotely, Defendant Wessels attempted to formally reprimand Plaintiff and Specialist Doe by creating a "write-up" for making common errors that all employees regularly made.

78.     Defendant Wessels emailed the alleged write-ups to Plaintiff and Specialist Doe.

79.     Plaintiff and Specialist Doe were confused by the process Defendant Wessels was using, as it was not the normal write-up process, so they reached out to Plaintiff's Union.

80.     The Union reached out to HR regarding the write-ups saying that they were not justified and because Defendant Wessels had not used the standard forms required for writing-up employees.

81.     On information and belief, HR then reached out to Defendant Wessels and told her that she needed to go through the correct process and complete the correct form and have a formal meeting with both Specialist Doe and Plaintiff regarding the write-ups.

82.     After Plaintiff requested her Union Representative be present for any formal meeting, Defendant Wessels backtracked and said that having a Union Representative wasn't necessary as the write-ups were only "educational." Plaintiff insisted that a Union Representative be present.

83.     At the meeting, Defendant Wessels had another supervisor present and Plaintiff came with a Union Representative.

84.     During the meeting, Defendant Wessels told Plaintiff that the write-up was only "educational."

85.     This was the first write-up that Plaintiff had ever received, and she refused to sign the document because she believed it to be continued retaliation.

86.     On information and belief, Defendant Wessels had not given any employee, including Charing Party, "educational" write-ups in the past and "educational" write-ups were not a formal or accepted way to educate or reprimand employees of Defendants.

87.     On information and belief, Defendant Wessels knew that she had no legitimate reason to give Plaintiff a formal write-up, and only gave her one in an attempt to retaliate against her and bully her because of her maternity leave and because she had demanded equal pay.

### Defendant Wessels Denies Plaintiff Time Off

88.     On information and belief, Defendant Wessels had the authority to approve Paid Time Off ("PTO") days. Additionally, she was required to allow half the staff off for each holiday.

89.     In or about late June 2020, Defendant Wessels approved Specialist Doe's request to take the 4th of July holiday off. Because she was limited to having half-staff, she then began asking other employees who wanted off. After doing this, Defendant Wessels approached and offered Team Leader Bullock and Specialist Paganetti July 4th off, but did not offer it to Plaintiff.

90.     Plaintiff asked Defendant Wessels for July 4th off via email.

91.     Defendant Wessels rejected Plaintiff's request and told her that two employees needed to be in the office, and Plaintiff knew that Defendant Wessels had already offered the day off to Specialist Paganetti.

92.     Plaintiff complained that July 4th would be Specialist Paganetti's seventh consecutive day off.

93.     Plaintiff then complained to the Union about Defendant Wessels offering July 4th off to Specialist Paganetti, even though Plaintiff specifically had requested that day off, but after the Union contacted HR, HR responded there was nothing they could do.

94.     When Plaintiff had returned from leave, she was approved to use six days of her intermittent leave in August. In the beginning of August, Plaintiff requested one additional PTO day off in August at the end of her already approved FMLA leave.

95.     Defendant Wessels, who had already approved Plaintiff's six days of intermittent leave, denied the final PTO day Plaintiff requested off.

96.     Defendant Wessels stated that no one could be out of the office for seven days as the reason she denied Plaintiff's request.

97.     Defendant Wessels denied Plaintiff's single day of PTO because it would result in her being scheduled out of the office for seven days even though less than a month prior Defendant Wessels had suggested to Specialist Paganetti that she take off July 4th, resulting in Director Paganetti having a seven-day vacation, which would have been six if not for Defendant Wessels' offer.

98.     Upset about the disparate treatment in days off, Plaintiff complained to the Union about Defendant Wessels continuing to deny her PTO day off in August 2020, pointing out that her reason was because it would result in Plaintiff being out of the office for seven days despite granting Specialist Paganetti a seven-day vacation less than one month prior.

99.     When the Union approached Defendant Wessels about the discrepancy, Defendant Wessels responded by saying, "what is the reason for a request if I can't deny it?"

100.    After this statement, Defendant Wessels shut her office door in the Union Delegate's face.

### The Hostile Work Environment Continues

101.    On or about December 2020, Director Wessel's hostility towards Plaintiff and Specialist Doe became so extreme that it resulted in Defendant Wessels screaming at them at the end of the work day after they confronted her about ignoring them in the office.

102.    During this time, Defendant Wessels would also reprimand Plaintiff if she was late or tried to work from home because of a snow storm. Defendant Wessels would require Plaintiff to come into the office and arrive on time regardless of the snow conditions. Defendant Wessels did not subject Specialist Paganetti to the same standards despite living in the same area as Plaintiff and would forgive tardiness during snowstorms.

### Plaintiff Informs Defendant Wessels That She is Pregnant

103.    On December 28, 2020, over a year since she returned from her 10 weeks of FMLA leave, while out of the office on a winter vacation Plaintiff told Defendant Wessels that she was pregnant via text message because she was scared of telling her in person due to how Defendant Wessels responded to Plaintiff's last pregnancy announcement.

104.    Although Plaintiff was scared for her career to tell Defendant Wessels about her pregnancy because of the way she had been treated over the past year, she had to because she needed to take a couple hours off for a physician's appointment the following week.

105.    Defendant Wessels merely responded by saying ok.

106.     Unlike the first time Plaintiff informed Defendant Wessels she was pregnant, Defendant Wessels did not refer Plaintiff to HR or tell Plaintiff of her rights under the FMLA for a second set of 12 weeks of leave.

107.     Plaintiff was entitled to a second 12 weeks of FMLA protected leave because over one year had passed since her 10 weeks of leave in 2019 and, even though she had used some intermittent leave, she had worked 1250 hours in the preceding year, and would work well over the required 1250 hours before she needed to use the FMLA protected leave for this pregnancy.

**Plaintiff is Exposed to COVID and Continues to Face a Hostile Work Environment**

108.     On or about January 7, 2021, Plaintiff was exposed to COVID. Up until this point, Plaintiff dropped her kids off every day to her parents' house for childcare. On or about January 8, 2021, Plaintiff's father went to the hospital, where he tested positive for COVID. Both of Plaintiff's parents were positive for COVID, and some of her siblings were positive as well.

109.     On or about January 8, Plaintiff texted Defendant Wessels that she believed her father was having a heart attack (no one knew it was COVID at this time).

110.     When Plaintiff learned of her father's positive COVID result, she notified Defendant Wessels immediately, also letting her know that Plaintiff had last seen her father on January 7, 2021, and therefore was exposed.

111.     Defendant Wessels told Plaintiff to be tested right away in accordance with hospital policy.

112.     At this time, Plaintiff told Defendant Wessels that she was feeling achy and had a headache, but had not yet received the results of her COVID test.

113.     Plaintiff contacted Defendant's Employee Health department to discuss the COVID policy because her physician had specifically told her that she needed to remain quarantined.

114.    Due to Plaintiff's pregnancy and her physician's instructions to stay quarantined, Plaintiff asked that she be allowed to work remotely during her quarantine period, as a reasonable accommodation.

115.    Defendant Wessels responded that she could not arrange Plaintiff to work from home, despite being exposed to COVID. Defendant Wessels indicated that she would ask Defendant Bon Secours' administration department about the arrangement.

116.    Plaintiff had previously worked from home for four weeks due to COVID using work-provided laptops. During her previous time working from home, Plaintiff was able to call insurance companies from her cell phone, and fax directly from her computer. On information and belief there was no business reason to require Plaintiff to come into the office while she was required to quarantine.

117.    Early in the day on January 11, 2021, Plaintiff reached out to Defendant Wessels and explained that she had not received her COVID test results yet. At this time, Plaintiff again requested that she be allowed to work remotely, as she had successfully done for four weeks earlier in the year, however, Defendant Wessels told Plaintiff that she had not even put in the request with Defendant Bon Secours' administration department, despite Plaintiff making it several days before.

118.    On January 11, 2021, at the end of the day, Plaintiff found out she tested negative for COVID and immediately notified Defendant Wessels.

119.    In response, Defendant Wessels told Plaintiff via text message that working from home was not "an option."

120.    Defendant Wessels had not given Plaintiff any other accommodation suggestion outside of simply denying her reasonable accommodation request to work remotely for a short

16

period of time to confirm she did not have COVID, as COVID would be high-risk for her because of her pregnancy.

121.    Defendant Wessels did not give Plaintiff the option, or even notify Plaintiff of her rights, to use some of her FMLA leave to which she was entitled to because it had been well over 1 year and 1250 hours worked since she returned from her pervious FMLA protected leave.

122.    On or around January 11, 2021, Plaintiff sent a lengthy email to Donna Nikaj, Director of Case Management and Defendant Wessels' supervisor ("Director Nikaj"), notifying Director Nikaj that Plaintiff was unable to come to work due to COVID exposure. She informed Director Donna of the dates and circumstances of her covid exposure, and also informed her that she did not have access to her work because Defendant Wessels had denied her reasonable accommodation request. Plaintiff did not receive a response.

123.    On or around January 12, 2021, Plaintiff had another COVID test, which once again came back negative, but she was still under her physician's orders to remain quarantined.

124.    At this point, Plaintiff reached out by phone to HR and spoke with an HR representative named Amy [last name unknown] who confirmed with Plaintiff that she had to come into the office despite her physician's orders to quarantine.

125.    On or about January 12, 2021, Plaintiff also reached out to Kim Hekler in HR, and was again told she needed to come into the office.

126.    No one from Defendants offered any other accommodation or engaged in any form of interactive process.

### Plaintiff is Terminated for "No Show" Despite Continuing to Perform Her Duties

127.    Over the next couple days, Plaintiff had still not received a response from Director Nikaj, who, on information and belief, was the person who could approve Plaintiff's work from

home request, and because she was still under physician's orders to quarantine, Plaintiff remained out of work for fear of spreading the virus.

128.     On or around January 15, 2021, Defendants terminated Plaintiff's employment. She was accused of "abandoning her position" and of "failing to call off or show up" her alleged failure toto her shifts, even though she had informed Defendants she was quarantined.

129.     On or around January 18, 2021, Plaintiff's coworker, Specialist Doe, organized for Plaintiff's belongings to be packed up.

130.     On information and belief, Defendant Wessels went through the box to inspect whether or not Plaintiff's belongings had client/patient information in it. Defendant Wessels took Plaintiff's notebook, which had notes of the abuse that Plaintiff had experienced under Defendant Wessels.

131.     Defendants terminated Plaintiff before she would need to use FMLA protected leave.

132.     On information and belief, Defendants pre-textually terminated Plaintiff because of her pregnancy, in retaliation for seeking equal pay, and because they did not want to provide her with leave she was entitled to. Defendant Wessels made it all too clear that neither pregnancy nor sick leave was acceptable under her watch.

### AS FOR THE FIRST CAUSE OF ACTION
*Interference and Retaliation Under the Family and Medical Leave Act*
*(Against Corporate Defendant)*

133.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

134.     Section 2612(a) of the FMLA, states in pertinent part:

(1) In general. Except as provided in subsection (b), any eligible employee who takes leave under section 102 for the intended purpose of the leave shall be

entitled, on return from such leave: (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

135.    Section 2615(a) of the <u>Family Medical Leave Act</u>, states in pertinent part:

Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter…

136.    Defendant violated these sections as set forth herein.

137.    Despite Defendant's knowledge of Plaintiff's need for FMLA leave and intermittent leave, Defendant interfered with Plaintiff's rights by attempting to prevent Plaintiff from taking leave or using intermittent leave after finding out about both her pregnancies, notifying Plaintiff she could use FMLA protected leave during her COVID quarantine, and denying Plaintiff paid time off in retaliation for taking leave.

138.    Defendant had no good faith business justification for any of the actions taken against Plaintiff as alleged herein.

139.    As a result of Defendant's actions, Plaintiff was extremely humiliated, degraded, embarrassed, and emotionally distressed.

140.    As a result of the acts and conduct complained of herein, Plaintiff suffered a loss of income, loss of employment, loss of retirement benefits, the loss of a salary/pay, special damages, loss of benefits, other compensation which Plaintiff's employment included, and Plaintiff has also suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

141.    Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

142.    Plaintiff is entitled to the maximum damages allowable under this law.

## AND AS FOR THE SECOND CAUSE OF ACTION
*Gender, Pregnancy, and Disability Discrimination in Violation of*
*New York State Human Rights Law*
*(Against All Defendants)*

143.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

144.     Defendants have discriminated against and created a hostile work environment against Plaintiff on the basis of her gender,  pregnancy, and disability, in violation of the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* Plaintiff has suffered and disparate treatment as a result of Defendants' wrongful conduct.

145.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated non-disabled employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of paid time off and an accommodation for her disability, discriminatory termination, disparate terms and conditions of employment on the basis of her sex and pregnancy.

146.     Defendants denied Plaintiff's reasonable accommodation request and failed to engage in any form of interactive process, but instead, unilaterally denying her request and terminating her employment.

147.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

148.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AND AS FOR THE THIRD CAUSE OF ACTION
*Retaliation in Violation of the New York State Human Rights Law*
*(Against All Defendants)*

149.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

150.     Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

151.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from taking paid time off and terminating Plaintiff's employment in violation of the New York City Human Rights Law.

152.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

153.     As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

154.     By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*Aiding and Abetting Discrimination and Retaliation under the NYSHRL*
*(Against Defendant Wessels)*

155.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

156.    New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

157.    Defendant Wessels aided and abetted the gender discrimination, pregnancy discrimination, disability discrimination and retaliation against Plaintiff.

158.    Defendant Bon Secours fosters, and throughout Plaintiff's employment fostered, an environment which discriminates against pregnant women and women who took leave related to pregnancy.

159.    Defendant Wessels aided and abetted the gender, pregnancy, and disability discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to investigate said discrimination, and by creating a hostile work environment that resulted in Plaintiff's constructive termination.

160.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

### AS AND FOR THE FIFTH CAUSE OF ACTION
*Aiding and Abetting Discrimination and Retaliation under the NYCHRL*
*(Against Defendant Wessels)*

161.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

162.    New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

163.     Defendant Wessels aided and abetted the gender discrimination, pregnancy discrimination, disability discrimination and retaliation against Plaintiff.

164.     Defendant Bon Secours fosters, and throughout Plaintiff's employment fostered, an environment which discriminates against pregnant women and women who took leave related to pregnancy.

165.     Defendant Wessels aided and abetted the gender, pregnancy, and disability discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to investigate said discrimination, and by creating a hostile work environment that resulted in Plaintiff's constructive termination.

166.     As a direct and proximate result of this unlawful conduct, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

**AND AS FOR THE SIXTH CAUSE OF ACTION**
*Unequal Pay in Violation of the New York Equal Pay Act*
*(Against all Defendants)*

167.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

168.     Defendants violated the right of Plaintiff to be paid the same as male, and non-pregnant, non-Hispanic employees performing equal or substantially similar work in violation of the New York Labor Law § 194.

169.     Defendants were aware of their unfair pay practices but did not rectify or investigate those unlawful pay practices.

170.     Defendants' violations of New York Equal Pay laws were therefore willful, entitling Plaintiff to lost wages, statutory liquidated damages, and punitive damages.

## AND AS FOR THE SEVENTH CAUSE OF ACTION
*Retaliation in Violation of the New York Equal Pay Act*
*(Against all Defendants)*

171.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

172.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' pay disparity.

173.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, unwarrantedly writing up Plaintiff for common errors, denying Plaintiff paid time off, and ultimately terminating her employment in violation of the New York Equal Pay Act and New York Labor Law § 215.

174.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

175.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

176.    By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, for all compensatory, liquidated, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(a)    Declaring that by the acts and practices complained of herein, Defendants has violated the FMLA, New York State Human Rights Law, and the New York Equal Pay Act.

(b)    Declaring that Defendants engaged in violations of the New York Equal Pay Act and the NYLL;

(c)    Directing Defendants to make Plaintiff whole for all earnings she would have received but for Defendants' discriminatory and retaliatory treatment, including but not limited to, lost wages, pension, and other benefits;

(d)    Directing Defendants to pay Plaintiff liquidated damages for interfering with her rights under the FMLA;

(e)    Awarding Plaintiff compensatory damages in back pay with interest and equity pay based on Plaintiff's appropriate compensation had her rights not been violated and had she not been discriminated against.

(f)    Awarding Plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

(g)    Awarding Plaintiff punitive damages as relates to the malicious and willful conduct of Defendants;

(h)    Awarding Plaintiff pre- and post-judgment interest;

(i)    Awarding Plaintiff costs and reasonable attorneys' fees; and

(j)     Granting Plaintiff such other and further relief as this Court deems necessary and proper.


Dated: New York, New York
        April 14, 2023

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorney for Plaintiff*

                                  By: /s/ *Megan S. Goddard*

                                        Megan S. Goddard, Esq.
                                        Siobhan Klassen, Esq.
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Office: 646-504-8363
                                        Fax: 212-473-8705
                                        Megan@goddardlawnyc.com
                                        Siobhan@goddardlawnyc.com