UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SAMANTHA DEJESUS,

**Civil Action No.: 23-cv-00806**
**(VLB) (AEK)**

Plaintiff,

-against-

BON SECOURS COMMUNITY HOSPITAL,
and LYN WESSELS,

Defendants.
-----------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

**GODDARD LAW PLLC**
**39 Broadway, Suite 1540**
**New York, New York 10006**
**Office: (646) 964-1178**

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ i-iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

ARGUMENT.................................................................................................. 7

    I. Motion to Dismiss Standard........................................................ 7

    II. Because the Amended Complaint Sufficiently Alleges Plaintiff's Claims Under FRCP Rule 8 and the Controlling Rule 12 Motion to Dismiss Standard, Defendants' Motion Should Be Denied.................................. 8

        A. Plaintiff Sufficiently Alleges Disability Discrimination ............. 10

        B. Plaintiff Sufficiently Alleges Gender and Pregnancy Discrimination and a Hostile Work Environment ................................................. 12

        C. Plaintiff Sufficiently Alleges Unequal Pay.................................. 15

        D. Plaintiff Sufficiently Alleges Retaliation..................................... 17

        E. Plaintiff Sufficiently Alleges FMLA Interference and Retaliation ...................................................................................... 20

        F. Plaintiff Sufficiently Alleges Individual Claims Against Wessels .......................................................................................... 23

CONCLUSION .................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page**

*Avila-Blum v. Casa de Cambio Delgado, Inc.,*
    519 F. Supp.2d 423 (S.D.N.Y. 2007) ...................................................................22

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................7,10

*Brown v. The Pension Boards*,
    488 F.Supp.2d 395 (S.D.N.Y. 2007) .......................................................................21

*Buon v. Spindler,*
    No. 19-cv-6760 (S.D.N.Y Mar. 18, 2021) ................................................... *passim*

*Burlington Indus. v. Ellerth,*
    524 U.S. 742 (1998)............................................................................................9

*Conley v. Gibson,*
    355 U.S. 41 (1957)............................................................................................7

*Debell v. Maimonides Med. Ctr.,*
    No. 09-CV-3491 SLT RER, 2011 WL 4710818 (E.D.N.Y. Sept. 30, 2011) ..........21

*Di Giovanna v. Beth Israel Medical Center,*
    651 F. Supp. 2d 193 (S.D.N.Y. 2009) ...................................................................22

*Gallagher v. Delaney,*
    139 F.3d 338 (2d Cir. 1998) ......................................................................9,12,19

*Golden v. New York City Dept. of Environmental Protection,*
    2007 WL 4258241 (S.D.N.Y. Dec. 03, 2007).......................................................22

*Graves v. Finch Pruyn & Co., Inc.,*
    457 F.3d 181 (2d Cir.2006) ..................................................................................19

*Henry v. NYC Health & Hosps. Corp.,*
    18 F. Supp. 3d 396 (S.D.N.Y. 2014) ..............................................................19,20

*LeClair v. Berkshire Union Free Sch. Dist.,*
    2010 WL 4366897 (N.D.N.Y. Oct. 28, 2010).......................................................22

*Lievre v. JRM Constr. Mgmt., LLC,*
    No. 17-CV-4439 (BCM), 2019 WL 4572777 (S.D.N.Y. Sep. 20, 2019) ...............22

*Reilly v. Revlon, Inc.,*
   620 F.Supp.2d 524 (S.D.N.Y. 2009) ....................................................22

*Rodriguez v. Atria Sr. Living Grp., Inc.,*
   887 F. Supp.2d 503 (S.D.N.Y. 2012) ..............................................10,19

*Scheuer v. Rhodes,*
   416 U.S. 232 (1974)............................................................................7

*Slaughter v. Am. Bldg. Maint. Co.,*
   64 F.Supp.2d 319 (S.D.N.Y. 1999) ....................................................21

*Stratton v. Dep't of the Aging for the City of N.Y.,*
   132 F.3d 869 (2d Cir. 1997)................................................................17

*Tambash c. St. Bonaventure Univ.,*
   99CV967, 2004 WL 2191566 (W.D.N.Y. Sept. 24, 2004)....................21

*Weixel v. Board of Educ. of the City of New York,*
   287 F.3d 138 (2d Cir. 2002) ...............................................................19

## PRELIMINARY STATEMENT

At the apex of the COVID-19 pandemic in January of 2021, Plaintiff, a Hispanic woman who worked for the hospital defendant here, discovered that multiple members of her multigenerational family had been infected with the virus.  Plaintiff was pregnant, and consistent with the prevailing medical advice and CDC guidelines at the time, a physician directed Plaintiff to quarantine.  Plaintiff's job duties for Defendants consisted of communicating with insurance companies, and so her work could be performed entirely remotely (and had been during an earlier stage of the pandemic). Accordingly, Plaintiff went to Defendants seeking the reasonable accommodation that she be simply allowed to work from home until her doctor released her from quarantine.  Plaintiff was not seeking paid leave or some exotic accommodation; only that she be able to perform her job safely, as to herself and others she might infect.

Rather than offering Plaintiff a reasonable accommodation – or even engaging the interactive process required– Defendants fired Plaintiff, leaving her pregnant and unemployed.

Plaintiff's abrupt termination was the culmination of a series of discriminatory and retaliatory acts by Defendants.  For instance, earlier in her employment with Defendants, Plaintiff had become pregnant another time, and took the pregnancy-related leave that she was legally entitled to.  On returning to work, however, she was subjected to a perpetual campaign of harassment and retaliation orchestrated by her superior, the individual defendant here, and joined by co-workers who resented having their schedules altered because Plaintiff took pregnancy leave.

Plaintiff was also separately subjected to both racial and gender discrimination, as well as unequal pay relative to comparable coworkers.  Plaintiff complained to Defendants that she was paid less than a male who did the same job and who had been hired on the same day.  She also complained that similarly situated non-pregnant, non-Hispanic women were paid considerably

more than her.  As with her pregnancy leave, Plaintiff's engaging in protected activity concerning her unequal pay gave rise to numerous instances of retaliation.  No single incident was particularly stark but, cumulatively, and in concert with the abundant discriminatory conduct Plaintiff endured, Defendants' pattern of discrimination and retaliation is unmistakable – and, to the point here, sufficiently pleaded to defeat Defendants' motion to dismiss.

That pattern of discrimination and retaliation reached its ultimate expression in Defendants' retaliatory termination of Plaintiff just days after she sought a reasonable COVID accommodation and just over two weeks since she informed Defendants of her second pregnancy and need for leave under the Family and Medical Leave Act ("FMLA"). Defendants did not want to allow Plaintiff to have FMLA leave again, and used her need for a reasonable accommodation as pre-text to terminate her employment to avoid providing leave and in continued retaliation for her complaints of unlawful employment practices.

Defendants' motion to dismiss variously argues that the discrimination and retaliation that Plaintiff experienced lack sufficient severity, and in so doing entirely ignores recent Second Circuit precedent holding that even if an isolated instance of apparent discrimination might not be actionable, on its own, courts must look to the totality of circumstances – or the overall "mosaic" of an employer's conduct – in assessing a plaintiff's allegations of discrimination and retaliation. Defendants also urge the Court to adopt an unduly strict reading of Fed. Rule. Civ. P. Rule 8's notice pleading requirements, and on that basis to dismiss every one of Plaintiff's claims, arguing that the operative Amended Complaint requires a level of detail that an individual plaintiff could not possibly possess at the initial pleading stage, without the benefit of discovery.  Again, Defendants are not aligned with Second Circuit precedent.

Plaintiff has sufficiently alleged discrimination and retaliation; that comparators were similarly situated in their jobs but not subjected to the same discrimination and retaliation; and that she was fired soon after seeking a reasonable accommodation and notifying Defendants of her need for leave under the FMLA.

Accordingly, Defendants motion should be denied. Or, to the extent that the Court were to grant portions of Defendants' motion, Plaintiff should be afforded leave to amend to add whatever detail or points of clarification the Court might require.

## STATEMENT OF FACTS

Plaintiff Samantha DeJesus ("Plaintiff") worked for Defendant Bon Secours Community Hospital ("Defendant" or "the hospital") as an authorization specialist, which principally entailed calling faxing insurance companies to obtain authorizations for payments. *See* First Am. Compl. ¶ 14. On December 28, 2020, Plaintiff informed Defendants she was pregnant for the second time while employe by Defendants. *Id.* ¶ 103-105. Defendants barely acknowledged Plaintiff's exciting announcement, and the only response she got from anyone from Defendants was "ok." *Id.* Just days later, in January of 2021, at the height of the COVID-19 omicron wave, Plaintiff was exposed to COVID-19 while pregnant and regularly interacting with her intergenerational family. As was her custom, Plaintiff would drop her infant children off at her their grandparents' home before heading to work at Defendant Bon Secours Community Hospital. On January 8, 2021, Plaintiff learned that both of her parents had tested positive for COVID-19, and that some of Plaintiff's siblings had COVID, as well. Plaintiff's doctor directed her to quarantine. Plaintiff immediately informed her supervisor, Defendant Lyn Wessels ("Wessels"), that she had been exposed to COVID-19 and that a physician had instructed her to quarantine. *Id*. at ¶¶ 108-113.

In light of her exposure to COVID-19, the heightened risk to intergenerational families such as Plaintiff's, and a physician's specific direction that she quarantine, Plaintiff requested of Wessels the reasonable accommodation that Plaintiff simply be allowed to work from home. *Id*. at ¶ 114. In the early days of the pandemic, workers such as Plaintiff at the hospital who, unlike frontline healthcare workers, did not need to be physically present at the hospital, had successfully worked from home, making phone calls and sending faxes. *Id*. at ¶¶ 116.  However, Defendant Wessels tentatively denied Plaintiff's requested accommodation, while also indicating that she would inquire into whether Plaintiff's requested accommodation could be approved.  *Id*. at ¶ 114.

Days passed and, on January 11, 2021, Plaintiff again inquired with Wessels about her requested accommodation.  *Id*. at ¶ 117.  Wessels informed Plaintiff that she had still not "put in" Plaintiff's request for an accommodation.  Later that day, Plaintiff informed Wessels that although she had just received negative COVID test results, she remained under a physician's order to quarantine, as the test would not necessarily have captured a relatively recent exposure from either her parents or family members.  *Id*. at ¶¶ 118, 123.  Even so, Wessels summarily denied Plaintiff's requested accommodation, telling Plaintiff that working from home was "not an option," and refusing to consider any other accommodation.  *Id*. at ¶¶ 119-20.

In response, on January 11, 2021, Plaintiff sent a detailed email to Wessels's superior, explaining her COVID exposure, her doctor's directive that she quarantine, and that Wessels had rejected Plaintiff's work-from-home accommodation request. *Id*. at ¶ 122. There was no response to Plaintiff's email. *Id*. So, on January 12, 2021, Plaintiff made two additional inquiries to the hospital's human resources department, and both times her requested accommodation was denied, without the hospital engaging in any interactive process with Plaintiff. *Id*. at ¶¶ 124-26.

Three days later, on January 15, 2021, the hospital terminated Plaintiff – despite her being quarantined by a physician and her multiple attempts to engage the hospital in an interactive process to arrive at a reasonable accommodation – with the claim that Plaintiff had "abandon[ed] her position." *Id*. at¶ 128.

Plaintiff's retaliatory and discriminatory firing was the culmination of multiple similar incidents during her time working for Defendants. For instance, Plaintiff had become pregnant in addition to the pregnancy she announced in December 2020 and both times she had experienced pregnancy discrimination. The first time, Defendant Wessels engendered and encouraged resentment among Plaintiff's co-workers because Plaintiff took legally mandated pregnancy leave. *Id*. at ¶¶ 24-30; 48-57. Far from being isolated or trivial, the resentment against Plaintiff for taking pregnancy leave had tangibly adverse consequences for Plaintiff, materially impeding essential communications with colleagues. *Id*. at ¶ 50. Additionally, in retaliation for Plaintiff having taken pregnancy leave, Defendant Wessels regularly denied Plaintiff's requests to take off ordinary holidays and vacation days while granting the same requests for Plaintiff's similarly situated coworkers. *Id*. at ¶¶ 42-47.

Plaintiff was also subjected to unequal pay, both because of her gender and pregnancy status, and was retaliated against for raising the issue with Defendants. *Id*. at ¶¶ 61-87. In May of 2020, Plaintiff brought her unequal pay complaint to the attention of Defendant Wessels. *Id*. at ¶¶ 65. There were two aspects to Plaintiff's disparate pay complaint. First, Plaintiff was paid less than a male co-worker hired on the same day as her and performing functionally identical work. *Id*. at ¶¶ 14, 16; 64. Second, Plaintiff was paid substantially less than similarly situated non-pregnant, non-Hispanic women working for the hospital. *Id*. at ¶¶ 14, 17; 64.

After Plaintiff took her disparate pay complaint to both her union representative and the hospital's human resources department, the hospital did agree to pay Plaintiff the same hourly wage as her male colleague but did not either remedy the pay disparity between Plaintiff and her non-pregnant female colleagues or compensate Plaintiff retroactively for the period during which she had endured the pay disparity relative to her male colleague.  *Id*. at ¶¶ 70-76. Further, Defendant Wessels retaliated against Plaintiff for having raised the pay disparity issue, issuing contrived, off-the-books "write-ups" and denying Plaintiff time off while permitting time off for employees who had not taken pregnancy leave and had not complained about disparate pay. *Id*. at ¶¶ 77-100. Most vividly, Plaintiff was denied time off when Defendant Wessels informed her that, per hospital policy, she could not take off seven consecutive days. *Id*. at ¶¶ 95-96. Yet only a month earlier, Defendant Wessels had approved another employee's seventh consecutive day off, on July Fourth, while denying Plaintiff's request to take the same holiday off, and only that single day. *Id*. at ¶¶ 89-97.

Similarly, over the course of her employment leading to her retaliatory termination, Plaintiff was regularly subjected to substantially more stringent and literal enforcement of tardiness rules than other employees of Defendants who had neither been pregnant nor engaged in protected activity such as Plaintiff's complaint about unequal pay.  *Id*. at ¶¶ 101-02.

Then, in late December of 2020, Plaintiff informed Defendant Wessels that she was pregnant again (First Am. Compl. ¶ 103),  putting them on notice that she would need FMLA protected leave after she gave birth -- and thus faced the prospect of another course of discriminatory and retaliatory conduct akin to what had attended her earlier pregnancy. This was just two-weeks before Plaintiff would seek a reasonable work-from-home accommodation because

of her COVID exposure, which resulted in Defendants claiming that in seeking to engage them in an interactive process Plaintiff had somehow "abandoned" her job.

Consequently, Plaintiff filed the instant action against Defendants, alleging gender, pregnancy, disability, and racial discrimination, as well as retaliation and interference with Plaintiff's rights under the Family Medical Leave Act.

## **ARGUMENT**

### I.    **Motion to Dismiss Standard**

A federal complaint need only contain "a short and plain statement of the claim showing that pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint need not provide "detailed factual allegations."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, L.Ed. 2d 929 (2007).

Rather, Rule 8's modest objective is to "give the defendant fair notice of what the . . . claim is and the grounds on which it rests."  *Twombly*, 550 U.S. at 555, *quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed..2d 80 (1957). As such, a federal complaint must allege facts sufficient "to raise a reasonable expectation that discovery will reveal evidence" that ultimately supports a plaintiff's claims. *Twombly*, 550 U.S. at 556.

On a Rule 12 motion, therefore, a court is not in a posture of determining whether the plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Here, Plaintiff is entitled to offer evidence to support her claims. Plaintiff has amply satisfied the Rule 8 pleading standard, thereby fairly putting Defendants on notice as to her claims. Consequently, Defendant's motion to dismiss under Rule 12 should be denied in its entirety, or, to

the extent that the Court is inclined to grant any part of Defendants' motion, Plaintiff should be afforded leave to amend.

**II.     Because the Amended Complaint Sufficiently Alleges Plaintiff's Claims Under FRCP Rule 8 and the Controlling Rule 12 Motion to Dismiss Standard, Defendants' Motion Should Be Denied**

Defendants multiply argue that "the Amended Complaint fails to plausibly allege Plaintiff suffered an adverse employment action." Defs' Mem. P&A at 1; *see also id.* at 8, 9. But this contention is also repeatedly qualified: "The Amended Complaint fails to establish even a minimal inference that [] Plaintiff suffered an adverse employment action **other than her termination**." Defs' Mem. P&A at 9 (emphasis added); *eee also id.* at 15 ("At most, **apart from Plaintiff's termination**" no actionable retaliation against Plaintiff) (emphasis added).

In other words, Defendants' motion to dismiss rests on the argument that ***other than*** having been fired just days after requesting a reasonable accommodation because she had been exposed to COVID and ordered to quarantine by a doctor and just over two-weeks since notifying Defendants of her pregnancy and need to FMLA leave, Plaintiff suffered "no adverse employment action."

Additionally, Defendants attempt to characterize all of the discrimination and retaliation that preceded Plaintiff being fired as she was seeking a reasonable accommodation for her COVID exposure and informing Defendants of her pregnancy as mere "petty slights and trivial inconveniences." Defs' Mem. P&A at 14. On that basis, Defendants urge the Court to disregard these allegations and to grant their motion to dismiss.

Defendants have failed to take account of the state of the law in the Second Circuit, where what might arguably be non-actionable "petty slights and trivial inconveniences" when considered in isolation are, when considered in their totality, "the bits and pieces of evidence" that constitute

a "mosaic," from which a permissible inference of discrimination or retaliation might arise.  *See Gallagher v. Delaney,* 139 F.3d 338, 342 (2d Cir. 1998), *abrogated in part on other grounds by Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998)("explaining that "[plaintiff's] other allegations of discrimination, even if they do not independently constitute adverse employment actions, provide relevant background evidence by shedding light on Defendant[s'] motivation and thus bolster [her] claim that Defendants treated [her] differently because of [her] ethnicity").

As explained in a still more recent Second Circuit case:

Furthermore, [the plaintiff] listed a series of instances of disparate treatment in the workplace where she was allegedly subjected to job requirements and to discipline that was different than employees outside her protected class. *See id.* at 54–55 (discussing allegations that, unlike employees who were not African American or West Indian, Buon was, inter alia: (1) "required to make phone calls to students to inform them they could not wear Halloween costumes"; (2) "required to provide timely responses to meeting invitations"; (3) "not allowed to institute certain programs at her school"; (4) "disciplined for being late"; and (5) subjected to a "negative performance review, disciplinary meetings, and other forms of criticism"). **Although these alleged other instances of disparate treatment may not separately rise to the level of adverse employment actions, Buon is permitted to "[c]reat[e] a mosaic with the bits and pieces of available evidence" that, taken together, support a plausible inference of intentional discrimination with respect to the decisions to deny her application to be the RISE administrator, deny her application to work summer school, and terminate her position as SMS principal.**

*Buon v. Spindler*, No. 19-cv-6760 (S.D.N.Y Mar. 18, 2021) (emphasis added), *quoting Gallagher, supra.*, 139 F.3d at 342.

Here, too, even if particular "instances of disparate treatment may not rise to the level of adverse employment actions," those instances of disparate treatment are not to be altogether disregarded, as Defendants urge.  Rather they are, as the *Gallagher* and *Buon* courts have held, germane in their totality, and as a prelude to and basis for inferring discriminatory and retaliatory intent in Plaintiff's termination -- an unambiguously adverse employment action.

Finally, Defendants' moving papers omit virtually all of the detail both in the body of the Amended Complaint and comprised by its causes of action that amply give Defendants "fair notice" of Plaintiff's "claim. . . [and the] grounds on which [they] rest[]" *Twombly*, 550 U.S. at 555.

As is set forth below, Plaintiff has satisfied Rule 8's pleading standards and, accordingly, Defendants' motion to dismiss should be denied.

### A.  Plaintiff Sufficiently Alleges Disability Discrimination

Defendants incorrectly assert that Plaintiff could not be discriminated or retaliated against because she did not allege she had a disability. This analysis is inaccurate as "[r]Requesting a reasonable accommodation of a disability is an ADA-protected activity…even if the plaintiff's claim that [s]he was entitled to a reasonable accommodation is mistaken, so long as it was made in good faith." *Rodriguez v. Atria Sr. Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012). As a pregnant woman who had been instructed by her physician to remain quarantined after being exposed to COVID-19, Plaintiff had a "good faith" reason to believe she was entitled to the reasonable accommodation of working from home, particularly because she, and most, if not all, other employees, had successfully done so at the beginning of the pandemic.

As to Plaintiff's allegations that she was exposed to COVID and under a physician's orders to quarantine, Defendants argue only that "Plaintiff expressly acknowledges that she tested negative for COVID-19 on multiple occasions, but was supposedly quarantined."  Defs' Mem. P&A at 13.  The essence of Defendants' position is thus, first, that a negative COVID test is dispositive here and, second, Plaintiff's being "supposedly quarantined" is a dubious allegation.

Yet the memory of the height of the COVID pandemic is not so distant that Defendants' assertions are persuasive.  Foremost, it is entirely unextraordinary that a physician would have

directed a pregnant, Hispanic patient exposed to COVID in an intergenerational family setting and working in a hospital to quarantine – even in the absence of a positive test or the presence of a negative test. Further, Defendants offer no authority whatsoever for disregarding or even doubting that Plaintiff had been instructed to quarantine by her doctor.

Additionally, Plaintiff's prudent conduct and repeated requests that she simply be allowed to work from home were entirely ignored – apart from her retaliatory termination.  It was on January 8, 2021, that Plaintiff learned that both of her parents had tested positive for COVID-19. Plaintiff immediately informed Defendant Wessels of that and the fact that a physician had instructed her to quarantine; and on that basis Plaintiff requested the reasonable accommodation that she be allowed to work from home. First Am. Compl. ¶¶ 108-114. Defendants not only summarily denied Plaintiff's request for an accommodation, but, more importantly, did not engage in any interactive process whatsoever.  *Id*. ¶ 114.  Days passed, and Plaintiff multiply re-asserted her request for an accommodation, in writing, to Defendant Wessels, and to the hospital's human resources department.  *Id*. ¶ 117-126.  Yet Defendants persisted in not engaging in the legally required interactive process.  Defendants only response was to fire Plaintiff on January 15, 2021. *Id*. ¶ 128.

Had Defendants instead engaged an interactive process, they might well have identified accommodations mutually acceptable to Plaintiff and Defendants, or at least caused Plaintiff to be more fully informed of her rights and options. Did Plaintiff being pregnant have implications for her COVID exposure and possible infection as she awaited clearance from her doctor? Or, a hospital insisting on in-person work might have also inquired as to whether Plaintiff's physician's quarantine order was based on a professional expectation that she would likely test positive for

COVID despite having tested negative, owing to the well-known time gap between exposure and virus being detectable in sufficient quantities to trigger a positive test result.

Defendants never asked. Instead, they just fired Plaintiff, the capstone to her having experienced a consistent pattern of discrimination and retaliation.

Plaintiff's claims for both disability discrimination, retaliation and failure to engage in any interactive process under the New York State Human Rights Law, in concert with the Amended Complaint's extensively detailed narrative, thus fully satisfies Rule 8's pleading requirements. *See* First Am. Compl. ¶ 137. Accordingly, Defendants' motion should be denied.

### B.   Plaintiff Sufficiently Alleges Gender and Pregnancy Discrimination and a Hostile Work Environment

There is perhaps no more "adverse employment action" than being abruptly terminated, as Plaintiff was. And after repeatedly arguing that Plaintiff suffered no adverse employment action "apart from [her] termination," Defendants fall well short of their burden when confronted with an adverse employment action that cannot be argued away.

Defendants seek dismissal of all of Plaintiff's claims for discrimination, including those for a hostile work environment, whatever the discriminatory motive – gender or pregnancy – by arguing that Plaintiff has failed to "plausibly allege . . . that she suffered an adverse employment action giving rise to an inference of discrimination. Defs' Mem. P&A at 8.

In so doing, Defendants entirely ignore Second Circuit rulings by urging the Court to consider only whether discrete instances of discrimination are themselves actionable, as opposed to whether, in their totality, Plaintiff's allegations constitute an overall "mosaic" that could be a rational basis for an inference of discrimination. *See Buon*, supra. No. 19-cv-6760, *quoting Gallagher,* 139 F.3d at 342 ("Although these alleged other instances of disparate treatment may not separately rise to the level of adverse employment actions, Buon is permitted to '[c]reat[e] a

mosaic with the bits and pieces of available evidence' that, taken together, support a plausible inference of intentional discrimination with respect to the decisions to deny her application to be the RISE administrator, deny her application to work summer school, and terminate her position as SMS principal.'").

As in *Buon*, Plaintiff alleges numerous instances of disparate treatment that, even if they do not, in isolation, constitute adverse employment actions, in their totality they do in fact give rise to a reasonable inference of discrimination:

- Plaintiff alleges that, during her first pregnancy, there was an extended campaign of coworkers ostracizing and undermining her, with the support of her supervisor, Defendant Wessels.  *See* First Am. Compl. ¶¶ 24-57.

- Specifically, multiple employees were openly hostile to Plaintiff because they believed Plaintiff's pregnancy-related leave would adversely affect their work scheduled.  *See* First Am. Compl. ¶ 28.

- Following Plaintiff's pregnancy leave, and during the time after her return when Plaintiff took intermittent leave, one co-worker would pointedly turn her back ***whenever*** Plaintiff attempted to confer with the co-worker on a work-related matter, substantially impairing Plaintiff's ability to do her job.  *See* First Am. Compl. ¶¶ 50-51.

- This same co-worker would regularly receive public praise from Defendant Wessels, while Wessels would withhold all praise from Plaintiff.  *See* First Am. Compl. ¶ 50-51.

- Defendant Wessels would regularly reprimand Plaintiff for technical but generally excusable infractions – such as being late because of a snowstorm – whereas

13

Wessels overlooked the same tardiness on the part of non-Hispanic employees who had neither been pregnant nor taken pregnancy-related leave.  *See* First Am. Compl. ¶ 102.

Defendants ignore *Buon* and its Second Circuit predecessors by failing to acknowledge that these multiple incidents, even if not actionable adverse employment actions individually, are part of the overall "mosaic" giving rise to a reasonable inference that Plaintiff's termination, and any other adverse actions, were either discriminatory, retaliatory, or both.  These allegations not only support adverse treatment by Defendants, but also that Plaintiff was subjected to a hostile work environment as every single day she was subjected to the animosity of her colleagues and supervisor, not merely "trivial slights and inconveniences," only after they learned Plaintiff was pregnant.

Additionally, as to Plaintiff's pregnancy discrimination claim, Defendants argue that

Plaintiff appears to contend that Specialist Paganetti was given preferential treatment, and may be contending that Team Leader Bullock and Wessels were treated more favorably.  However, all three individuals are female, and Plaintiff does not allege with specificity that any of [Plaintiff's comparator coworkers] were not purportedly disabled or pregnant.

Defs' Mem. P&A at 11.  Yet Plaintiff alleges precisely that each of the three comparator coworkers identified by Defendants were not pregnant:

After Plaintiff informed Defendants of her upcoming pregnancy leave, Defendant Wessels, Plaintiff's co-worker, Specialist Carly Paganetti and . . . Team Leader Bullock, **none of whom were pregnant or recently pregnant during all of Plaintiff's employment**, began to ignore and ostracize Plaintiff, which they had not done before.

First Am. Compl.  ¶ 24 (emphasis added).

Recognizing all allegations in totality, Plaintiff has sufficiently plead discrimination based on her pregnancy and gender and that she suffered a hostile work environment.

14

Finally, Defendants contend that "[t]he Amended Complaint does not assert claims for discrimination on the basis of color."  Defs' Mem. P&A at n.1.  In fact, the Amended Complaint is replete with allegations both as to Plaintiff being Hispanic and relevant comparators not being Hispanic.  *See*, e.g., First Am. Compl. ¶¶ 6 ("Plaintiff is Hispanic."); 17 (referring to similarly situated coworkers paid more than Plaintiff as "non-Hispanic"); 69 (referring to Plaintiff as "the only woman of color in the office).  However, Plaintiff's allegations regarding her race are relevant to her claims that she was paid less than her non-Hispanic, non-pregnant peers and retaliated against under the New York Equal Pay Act, discussed *infra*.

### C.  Plaintiff Sufficiently Alleges Unequal Pay

Defendants attempt to secure dismissal of Plaintiff's disparate pay claims by complicating and obscuring a quite straightforward allegation:

> Defendants violated **the rights of Plaintiff to be paid the same as male, and non-pregnant, non-Hispanic employees performing equal or substantially similar work** in violation of New York Labor Law § 194.

First Am. Compl. ¶ 168 (emphasis added).

Plaintiff's ultimate allegation of unequal pay is supported by equally straightforward and detailed factual allegations.  *See* First Am. Compl. ¶¶ 61-87.  Defendants make much of the fact that, when Plaintiff met with Defendant Wessels to discuss her pay disparity, she did so with a *male* co-worker (referred to as "Specialist Doe") and that Plaintiff and Specialist Doe both raised the fact that two female employees were paid considerably more than Specialist Doe and Plaintiff. *See* Defs' Mem. P&A at 17.  However, in so doing, Defendants' altogether neglect to take account of Plaintiff's allegation that there are multiple sources of discrimination underlying her unequal pay claim, with Plaintiff expressly alleging that she was not paid as much "as male, and non-pregnant, non-Hispanic employees."  First Am. Compl. ¶ 168.

In fact, as the Amended Complaint recounts, in the meeting with Defendant Wessels, Plaintiff was complaining ***both*** that she was paid less than Specialist Doe, a man, ***and*** that she was paid less than two non-pregnant, non-Hispanic women.  *See* First Am. Compl. ¶¶ 61-87.  Whereas Plaintiff was paid $17/hour (First Am. Compl. ¶ 14), Specialist Doe, a male who was hired the same day as Plaintiff, was paid $18/hour (First Am. Compl. ¶ 16).  Likewise, Plaintiff's "straight, white, non-Hispanic coworkers made $21.00-$25.00 per hour."  First Am. Compl. ¶ 17.  *See also* First Am. Compl. ¶ 168 (specifying that these same workers were also non-pregnant).

No more availing is Defendants' claim that "the Amended Complaint is bereft of allegations plausibly supporting that Specialist Doe and Plaintiff had 'substantially equal' jobs." Defs' Mem. P&A at 17.  As to her male colleague, Specialist Doe, Plaintiff alleges that he had "the same experience and background in the field as Plaintiff" (First Am. Compl. ¶ 16) and that he "performed the same function and job duties during Plaintiff's employment with Defendants (First Am. Compl. ¶ 31).

Plaintiff also specifically alleges that her non-pregnant, non-Hispanic comparators were similarly situated.  *See* First Am. Compl. ¶¶ 31-32 ("Specialist Paganetti . . . performed the same functions and job duties as Plaintiff during Plaintiff's employment with Defendants. . . .  "Team Leader Bullock also performed largely the same functions and job duties during Plaintiff's employment with Defendants.").

Accordingly, Plaintiff has sufficiently plead unequal pay, under multiple theories of discrimination and, as such, Defendants' motion to dismiss must also be denied as to Plaintiff's sixth and seventh causes of action for unequal pay in violation of the New York Equal Pay Act.

### D.  Plaintiff Sufficiently Alleges Retaliation

As with Plaintiff's discrimination claims, her retaliation claims are built on a "mosaic" of incidents, culminating with Plaintiff's discriminatory and retaliatory firing.  Also, like Plaintiff's discrimination claims, there is often a confluence of motives to be reasonably inferred from Defendants' conduct, with plausible aspects of gender, race, and pregnancy discrimination evident in these instances of discriminatory and retaliatory conduct. Above all, Defendants' actions enumerated here make no logical sense outside of a discriminatory or a retaliatory motive.  *See Stratton v. Dep't for the Aging for the City of N.Y.,* 132 F.3d 869, 879 n.6 (2d Cir. 1997) ("Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of intent to discriminate.").

Specifically, there is no logical explanation for the numerous acts of retaliation that Plaintiff alleges, in addition to her termination:

- The Amended Complaint  alleges that, after Plaintiff engaged in protected activity by complaining about unequal pay because of gender and her pregnancy status, Defendant Wessels engaged in a gratuitous campaign of petty, gratuitous  "write-ups" – characterized as "educational" by Wessels, seemingly to avoid an official record -- targeting both Plaintiff and the coworker who had accompanied Plaintiff to the meeting with Defendant Wessels at which disparate pay was discussed, while no other hospital employees were similarly targeted by Defendant Wessels. *See* First Am. Compl. ¶¶ 77-87.

- The Amended Complaint also alleges retaliatory conduct by Defendants in Defendant Wessels disparate and punitive disposition of Plaintiff's requests for ordinary time off.  For instance, On July Fourth, a co-worker was granted the

holiday off by Wessels, whereas Plaintiff was not – even though that would be the coworker's seventh consecutive day off, in contravention of apparent hospital policy, and Plaintiff was seeking only the one day off.   *See* First Am. Compl. ¶¶ 88-93.

- Then, a month later, after returning from six days of intermittent pregnancy leave, Plaintiff requested an additional day of paid time off.  Defendant Wessels denied the request – this time invoking the purported "seven-day rule," against Plaintiff, and seemingly only against Plaintiff.  *See* First Am. Compl. ¶¶ 94-97.

Defendants argue that there could not possibly have been retaliation against Plaintiff for having complained about disparate pay, because "Plaintiff's alleged May 2020 complaint to Wessels regarding her pay was not protected activity."  Defs' Mem. P&A at 19.  Defendants reason that, because there was also a man present when Plaintiff met with Wessels, it couldn't possibly be protected activity: "The Amended Complaint characterizes this incident as Plaintiff and Doe – a *male* employee – approaching Wessels and complaining 'about being underpaid.'"  Defs' Mem. P&A at 19.

Defendants have both mischaracterized the circumstances of Plaintiff's disparate pay grievance and invented a rule whereby the presence of a male when such a grievance is made disqualifies a woman from making a valid unequal pay complaint based on gender, and thereby engaging in protected activity.   In fact, in addition to complaining about a gender-based pay disparity relative to a male employee hired the same day for the same work and making more (and who also happened to be present) Plaintiff *also* complained to Defendant Wessels that she was paid less than two non-pregnant, non-Hispanic but similarly situated women, constituting protected activities under the New York State Equal Pay Act and the New York State Human Rights Law.

18

*See* First Am. Compl. ¶¶ 14; 16; 17; 61-87 168. Additionally, for purposes of retaliation, "[r]equesting a reasonable accommodation of a disability is an [New York State Human Rights Law]-protected activity." *Rodriguez v. Atria Sr. Living Grp., Inc*., 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012) *citing generally Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir.2002); *see also Graves v. Finch Pruyn & Co., Inc*., 457 F.3d 181, 184 n. 3 (2d Cir.2006) ("A claim of disability discrimination under the New York State Human Rights Law ... is governed by the same legal standards as govern federal ADA claims."). Therefore, Defendants' termination of Plaintiff's employment just days after she engaged in the protected activity of requesting a reasonable accommodation can clearly be viewed as retaliation for engaging in protected activities.

No more availing are Defendants' cited authorities in attempting to argue that there is not the requisite "causal connection between any activity and any other adverse action." Defs' Mem. P&A at 20. Again, the foregoing acts of retaliation are, even if not individually adverse employment actions, cumulative evidence giving rise to the reasonable inference that Defendants' ultimate and unambiguously adverse employment action – terminating Plaintiff – was substantially motivated by the underlying discriminatory and retaliatory conduct that pervaded Plaintiff's time working for Defendants. *See See Buon*, supra. No. 19-cv-6760, *quoting Gallagher,* 139 F.3d  at 342. Yet Defendants altogether ignore the *Gallagher* and *Buon* "mosaic" line of cases, and instead rely on inapposite, earlier authorities such as *Henry v. NYC Health & Hosps. Corp*., 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014).

Defendants' reliance on *Henry*, is also misplaced. In *Henry*, unlike here, there was no allegation that multiple legally small acts of retaliation serve and an evidentiary basis for the plaintiff having been improperly terminated.  In fact, there is no credible allegation of the *Henry* plaintiff having been terminated at all:

> The Amended Complaint once obliquely refers to "plaintiff's discharge from employment, [citation omitted] but it is unclear whether this one-time reference is meant as an allegation of an adverse employment action. Henry does not mention this purported discharge even once in her brief, let alone argue that it constitutes a material change adverse to the conditions of her employment.

*Henry*, 18 F.Supp. 3d at n.6.

Here, by contrast, there is no lack of clarity in Plaintiff's essential allegation: Plaintiff was multiply subjected to acts of discrimination and retaliation on the basis of her disability, gender, pregnancy status, and having engaged in protected activity, and was ultimately fired just days after requesting a reasonable accommodation and being met with Defendants' repeated refusal to even engage the legally required interactive process and two-weeks after notifying Defendants of her pregnancy. Accordingly, Defendants' motion must also be denied as to Plaintiff's causes of action alleging retaliation for complaints of discrimination and unequal pay.[1]

### E.  Plaintiff Sufficiently Alleges FMLA Interference and Retaliation

Defendants do not argue that Plaintiff was not entitled to leave under the FMLA, that they did not provide leave under the FMLA, or that they did not retaliate against Plaintiff for needing leave under the FMLA, but rather incorrectly focus on the argument that because Plaintiff did not specifically apply for FMLA leave after informing them of her second pregnancy on December 28, 2020, that they could not have interfered with, denied, or retaliated against Plaintiff for her anticipated leave.[2] This argument is factually and legally incorrect. Defs' Mem. P&A at 23-25. "An employee seeking leave need not expressly invoke the FMLA in her notification; it is

---

[1] Defendants' argument that Plaintiff's unequal pay retaliation claim in untimely misstates the applicable law. Under section 215 of the New York Labor Law, there is a two-year statute of limitations. Plaintiff alleges that Defendants' termination of her employment on January 15, 2021 was, at least in part, motivated in retaliation for her complaints of unequal pay. Plaintiff filed a Summons with Notice on January 12, 2023, within the two-year statute of limitations. *See* Dkt. 1.

[2] Defendants reference Plaintiff's December 28, 2020 notice regarding her pregnancy and need for leave in a short paragraph at the end of the brief, and focus the majority of their argument stating that her 2019 leave is untimely under the FMLA. See Defs' Mem. P&A at 23-25. Plaintiff, while she does not concede that her 2019 leave is untimely, primarily relies on her 2021 need for leave to support her FMLA claims.

sufficient that she give a basis for her leave that qualifies under the FMLA." *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 408–09 (S.D.N.Y. 2007) *citing Slaughter v. Am. Bldg. Maint. Co., 64 F.Supp.2d 319, 325 (S.D.N.Y.1999).* "After the employee provides the required notice, 'the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying.'" *Id*. Plaintiff's statement to Defendant Wessels that she was pregnant was clear notice that she would need FMLA leave related to her pregnancy, as pregnancy is not only a qualified reason for FMLA leave, but Plaintiff had already used FMLA leave related to a prior pregnancy. In fact, at the time Plaintiff notified Defendants she was pregnant, no one form Defendants told Plaintiff of her rights under the FMLA. Both Defendants' arguments to dismiss Plaintiff's claims of interference and retaliation must fail as their single assertion to support those arguments, that she never requested leave, is both belied by the facts asserted and applicable law.

Additionally, the fact that Plaintiff had not used any leave or it had not begun to run at the time she was terminated is not determinative on if Defendants interfered with Plaintiff's FMLA rights. "Where an employer is aware that an employee may need to take FMLA leave, it would be inconsistent with the remedial purpose of the statute to allow an employer, motivated in part specifically to prevent the employee from obtaining leave under the FMLA, to terminate the individual before a more definitive request for leave could be made." *Tambash v. St. Bonaventure Univ.*, No. 99CV967, 2004 WL 2191566, at *11 (W.D.N.Y. Sept. 24, 2004); *recognized by Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491 SLT RER, 2011 WL 4710818, at *8 (E.D.N.Y. Sept. 30, 2011). Defendants knew that Plaintiff was going to take FMLA leave, had already openly expressed they did not like Plaintiff taking her previous FMLA leave, and terminated her employment just over two-weeks from the date they found out she would need FMLA leave. *See generally* First Am. Compl. As discussed *supra*, Defendants used Plaintiff's need to quarantine

due to COVID-19 exposure as pre-text to terminate her employment before she would need to use her leave.[3]

Defendants also violated the FMLA by discouraging Plaintiff from using her rights both during her first pregnancy and after she notified them of her second. Court frequently recognize a discouragement theory when employers do not outright deny a request for FMLA, but discourage the employee from actually using any leave pursuant to the FMLA, authorized or not. Courts have allowed "[a] Plaintiff who asserts a FMLA interference claim on a 'discouragement theory' to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave." *Reilly v. Revlon, Inc*., 620 F. Supp. 2d 524, 535–36 (S.D.N.Y. 2009) (*citing Golden v. New York City Dept. of Environmental Protection*, 2007 WL 4258241 (S.D.N.Y. Dec. 03, 2007)); *see also Avila-Blum v. Casa de Cambio Delgado, Inc*., 519 F. Supp. 2d 423, 428 (S.D.N.Y. 2007) (finding a disputed fact issue when plaintiff testified that the company threatened her job if she took FMLA leave).

Defendants did not notify Plaintiff of her ability to use FMLA leave at the time that they found out she was pregnant, or at the time that she told them her immediate family members had COVID-19, a circumstance expressly covered by the FMLA[4] during the pandemic and which

---

[3] Courts in this Circuit have disputed if these "interference by termination" cases are to be treated as interference or retaliation claims under the FMLA. *See Lievre v. JRM Constr. Mgmt*., LLC, No. 17-CV-4439 (BCM), 2019 WL 4572777, at *16 (S.D.N.Y. Sept. 20, 2019) (A plaintiff's theory "that his employer fired him to avoid any future obligation to provide FMLA leave…should be considered retaliation claims, not interference claims, and must therefore be analyzed under the McDonnell Douglas burden shifting framework"); *See, e.g., LeClair v. Berkshire Union Free Sch. Dist*., 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010) ("the Court finds that Plaintiff's theory of interference by termination is merely a retaliation theory in disguise"); *Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) ("this really is no more than an effort to dress Di Giovanna's retaliation claim in (barely) different clothing"). Therefore, even if the Court were to determine that Defendants did not **interfere** with Plaintiff's FMLA rights by terminating her employment before she could formally request or go on leave, Plaintiff has still plead facts to support that Defendants **retaliated** against Plaintiff by terminating her employment after notifying Defendants of her need for FMLA protected leave.

[4] In fact, the New York State Emergency Quarantine-Related Sick Leave required that employees who had been under a quarantine order be allowed paid leave. *See* https://paidfamilyleave.ny.gov/COVID19#:~:text=Some%20employers%20in%20New%20York,isolation%20due%20to%20COVID%2D19 (last visited May 31, 2023) (Some employers in New York State are required to provide at

would have necessarily not been acknowledged in any type of prior, general FMLA notification as the FMLA's pandemic measures were new and based on the unique requirements of a global, highly contagious and deadline virus.[5]  As discussed *infra*, Defendants actively retaliated against Plaintiff when she was using intermittent leave. By failing to notify her of her rights, and based on the treatment she suffered while she was using intermittent FMLA upon her return from her first pregnancy, Defendants discouraged Plaintiff from using FMLA leave at the time she announced her second pregnancy, therefore interfering with her rights prescribed by the statute.

### F.  Plaintiff Sufficiently Alleges Individual Claims Against Wessels

Defendants' cursory arguments as to the individual defendant here, Wessels, are easily dispatched.[6]

First, Defendants argue that because any claims against Wessels are "meritless because Plaintiff has failed to allege an underlying violation."  Defs' Mem. P&A at 15.  However, as is detailed above, the Amended Complaint satisfactorily alleges each of Plaintiff's seven causes of action, and abundantly alleges Defendant Wessels's complicity, as well.

Second, Defendants argue that the claims against Wessels must be dismissed because Plaintiff has not alleged that Wessels had "power to do more than carry out personnel decisions made by others."  Defs' Mem. P&A at 15, n.6.  In fact, Plaintiff specifically alleges that "[a]s Plaintiff's direct supervisor, Defendant Wessels had the authority to hire, fire, or affect the terms

---

least 5 or 14 days of job protected, paid COVID-19 sick leave to employees who need to take leave because they are under a mandatory or precautionary order of quarantine or isolation due to COVID-19.).

[5] *See https://www.dol.gov/agencies/whd/fmla/pandemic#4*  (last visited May 24, 2023) ("An employee who works for a covered employer, is eligible for FMLA, and is sick, or is caring for a family member who is sick, with COVID-19 may be entitled to leave under the FMLA under certain circumstances.").

[6] To the extent that the allegations against Defendant Wessels inadvertently reference claims arising under New York City law, Plaintiff hereby withdraws any such claims and/or moves to amend the operative complaint to comport with the withdrawal of such claims.

and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same."  First Am. Compl. ¶ 11.

Third, Defendants argue that because "Wessels herself is the alleged discriminator in this case, and an individual is legally incapable of aiding and abetting her own conduct."  Defs' Mem. P&A at 15.  Again, however, Defendants contention is at odds with what is actually set forth in the Amended Complaint.   Plaintiff alleges that numerous other coworkers participated in the discrimination against her.   *See*, e.g., First Am. Compl. ¶ 55.   Additionally, Plaintiff also specifically alleges that Defendant Wessels broadly "encouraged" Plaintiff's co-workers to do so, thereby aiding and abetting both the discrimination and retaliation against Plaintiff.  First Am. Compl. ¶ 54.

Accordingly, Defendants motion to dismissed must also be denied as to Plaintiff's fourth and fifth causes of action.

## **CONCLUSION**

For all the foregoing reasons, Defendants' motion should be denied; or, alternatively, to the extent Defendants' motion is granted, Plaintiff should be permitted leave to amend her Second Amended Complaint, and hereby moves for leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).

Dated: New York, New York
        June 2, 2023

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorney for Plaintiff*

                                    By: /s/ Megan S. Goddard
                                        Megan S. Goddard, Esq.
                                        Siobhan Klassen, Esq.
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Office: 646-504-8363

24

Fax: 212-473-8705
Megan@goddardlawnyc.com
Siobhan@goddardlawnyc.com