UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SAMANTHA DEJESUS,                                      :
                              Plaintiff,              :
                                                      :        **OPINION AND ORDER**
v.                                                    :
                                                      :        23 CV 806 (VB)
BON SECOURS COMMUNITY HOSPITAL             :
and LYN WESSELS,                                      :
                              Defendants.             :
-------------------------------------------------------------x

Briccetti, J.:

Plaintiff Samantha DeJesus brings this action against her former employer, Bon Secours

Community Hospital ("Bon Secours"), and her former supervisor, Lyn Wessels.  Plaintiff asserts

claims for retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601,

et. seq., and unequal pay in violation of New York Labor Law § 194.[1]

Now pending is defendants' motion for summary judgment.  (Doc. #92).

For the reasons set forth below, defendants' motion is GRANTED IN PART and

DENIED IN PART.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1]     This case was initially commenced in the Supreme Court of the State of New York, County of Orange, and removed to this Court based on this Court's original jurisdiction over plaintiff's FMLA claims.  Plaintiff's first amended complaint, which is the operative complaint here, alleges claims under the FMLA as well as the New York State Human Rights Law, the New York Labor Law, and the New York City Human Rights Law.  The latter claim was subsequently withdrawn.  In an Opinion and Order dated February 12, 2024, the Court dismissed all of plaintiff's claims except her claims for retaliation under the FMLA and for unequal pay under the New York Labor Law as compared to Specialist Doe.  (Doc. #32).

**BACKGROUND**

On June 19, 2017, plaintiff began work at Bon Secours as an authorization specialist. (Doc. #93-6).  Plaintiff and three other authorization specialists were supervised by defendant Wessels.  (Doc. #93-4 at 71–72).

In December 2018, plaintiff became pregnant with her second child.  (Doc. #93-4 at 101). Plaintiff informed Wessels of her pregnancy in February or March of 2019.  (Id. at 102). Plaintiff subsequently applied for FMLA leave in connection with this pregnancy, and her leave commenced after her second child was born on August 29, 2019.  (Id. at 105–06).

Plaintiff testified she overheard Wessels discussing plaintiff's use of leave with another authorization specialist, Kelly Bullock, and with human resources director, Kim Hirkaler.  (Doc. #93-4 at 110–13).  Plaintiff remembers hearing her name mentioned, as well as "FMLA" and "so much time."  (Id.).  Plaintiff understood Wessels, Hirkaler, and Bullock to be "trying to figure out" what FMLA leave to which plaintiff was entitled.  (Id.).

Plaintiff returned to the office on November 4, 2019, after ten weeks of leave, six of which were FMLA leave.[2]  (Doc. #98-2 at ¶ 2).  Plaintiff claims she chose to return to work on November 4 rather than use more leave because she was afraid her job was in jeopardy.  (Doc. #93-4 at 117).  According to plaintiff, the other authorization specialists told her that Wessels and Bullock believed plaintiff's use of FMLA leave was unfair to other people.  (Id. at 117–18).

After returning to the office, plaintiff requested to use her remaining six weeks of FMLA leave as intermittent leave over the ensuing months.  (Doc. #98-2 at ¶ 2).  In December 2019, Wessels made plaintiff choose in advance the dates on which plaintiff would be taking

---

[2]      Not all of plaintiff's leave was taken pursuant to the FMLA.  Plaintiff testified she also utilized "New York paid family leave," and "short-term disability" leave.  (Doc. #93-4 at 109, 121).

intermittent leave.  (Doc. #93-4 at 122–23).  Plaintiff testified Wessels directly told plaintiff her leave was "a lot of time" and "was not fair to the other people in the office."  (Id.).  Wessels could not remember this interaction.  (Doc. #93-13 at 106–07).

In any event, plaintiff's request was granted, and Bon Secours ultimately provided plaintiff with the full twelve weeks of FMLA leave to which she was entitled in connection with the birth of her second child.  (Doc. #93-4 at 261, 272–73).

In March 2020, plaintiff and the other Bon Secours authorization specialists began to work from home due to the onset of the Covid-19 pandemic.  (Doc. #98-1 at ¶ 35).  On May 5, 2020, Wessels informed the authorization specialists they would be required to return to in-person work on May 12, 2020.  (Doc. #93-12).  Other than this period between March 2020 and May 2020, authorization specialists were not allowed to work from home under any circumstances.  (Doc. #93-13 at 33–34).

On May 8, 2020, plaintiff sent a text message to Wessels to express concerns about returning to in-person work during the Covid-19 pandemic.  (Doc. #93-14 at ECF 5–12).[3] Among other things, plaintiff asked if Wessels would "take responsibility" if plaintiff's children passed away due to Wessels's "negligence" in bringing plaintiff back to in-person work.  (Id. at ECF 10–11).  Wessels forwarded this text message, which she believed was "threatening," to her supervisor, Camille Kurtz, and Hirkaler.  (Doc. #93-15).  Kurtz recognized that Bon Secours had encouraged plaintiff "to use personal time or FMLA" but nevertheless wanted to "discuss position elimination" because plaintiff was being "unrealistic and insubordinate."  (Id.).  There is no evidence Hirkaler responded to Wessels's message.  (Id.).  Hirkaler testified she was not

---

[3]    "ECF ___" refers to page numbers automatically assigned by the Court's Electronic Case Filing System.

involved in plaintiff's FMLA requests and could not remember any FMLA issues between plaintiff and Wessels.  (Doc. #93-22 at 38, 109).

Although plaintiff initially stated she would need to take a week of FMLA leave to situate her children prior to returning, plaintiff returned to in-person work on May 12, 2020. (Docs. ##93-14 at ECF 4–5; 93-4 at 128).

In November 2020, plaintiff learned she was pregnant with her third child.  (Doc. #93-4 at 172).  On December 30, 2020, plaintiff texted Wessels:

> Hi Lyn I wanted to let you know in advance I am expecting again and have been postponing care due to conflicts at work…I tried my best to be seen this week with no luck..I was given an appt for next Wednesday 1/6 at 2:30pm in Warwick and wanted to ask if I can work 8–1:30 and use 2 hours of my time …I'm already more than 10 weeks so I do need to go in soon.  I know Carley's out but I can bang as much out mon tues and most of Wednesday.  Kelly and the team are aware.  Please lmk.  Ty!

(Doc. #93-16).  Wessels responded "Ok." (Id.).  Other than this text, plaintiff did not otherwise request any accommodation in connection with her third pregnancy.

On Friday, January 8, 2021, plaintiff informed Wessels she would not be able to report to work because her father had suffered a heart attack.  (Doc. #93-17 at ECF 1).  Plaintiff later learned her father had not suffered a heart attack but rather had tested positive for Covid-19. (Doc. #93-4 at 179).  Plaintiff told Wessels her doctor advised her she would need to quarantine until she had gotten an accurate Covid test result.  (Doc. #93-17 at ECF 2).  Wessels directed plaintiff to call Bon Secours's Occupational Health group, which handled issues regarding testing.  (Id.).  Plaintiff followed up with Occupational Health, who explained plaintiff could report to work the following week as long as she remained asymptomatic.  (Id. at ECF 3). Plaintiff called Occupational Health a second time, and arranged to be tested the morning of Saturday, January 9, 2021.  (Id.).

On Sunday, January 10, 2021, plaintiff texted Wessels explaining that, even if she tested negative and could report to work, plaintiff did not have anyone to look after her children.  (Doc. #93-17 at ECF 5).  Plaintiff asked for permission to work from home until her childcare issue was resolved.  (Id.).  Wessels recognized the difficulty of plaintiff's situation but explained she could not arrange work from home without approval from administration.  (Id. at ECF 6).

On Monday, January 11, 2021, plaintiff informed Wessels she had tested negative for Covid-19.  (Doc. #93-17 at ECF 8).  Wessels told plaintiff that, despite her childcare issues, "working from home is not an option."  (Id.).  Wessels also encouraged plaintiff to follow up with Occupational Health to ensure plaintiff was cleared to return to work.  (Id.).  Occupational Health cleared plaintiff to return to work that same day.  (Docs. ##93-4 at 195–96; 93-18).

Despite being twice informed she was required to return to work, plaintiff did not report to the office from Tuesday, January 12 through Friday, January 15, 2021.  (Doc. #93-4 at 207–11).  At no time during this absence did plaintiff reach out to Wessels to explain her absence.  (Id.).  Nor did anyone from Bon Secours reach out to plaintiff during her absence that week.  (Doc. #98-2 at ¶¶ 11–14).

Wessels reported plaintiff's absence to human resources.  (Doc. #93-13 at 66–67).  Wessels believes she reached out to human resources on the first day of plaintiff's absence.  (Id.).  Wessels testified she "didn't know" whether she expected plaintiff to come in that week and understood plaintiff "said she couldn't" report to work.  (Id. at 68–69).

On Friday, January 15, 2021, Hirkaler called plaintiff to inform her she was being terminated based on her failure to report to work for four days in violation of Bon Secours's attendance policy.  (Docs. ##93-4 at 227; 93-21; 93-22 at 73–74).

Bon Secours's attendance policy states:

> No call/no show is the failure to contact a supervisor in advance of your scheduled start time if you require time off.  Failure to notify in advance will subject you to corrective or disciplinary action.  Failure to call in or report to work for three (3) consecutive days (or shifts) will be considered job abandonment and will be deemed a voluntary resignation.

(Doc. #93-20 at ECF 3).  The attendance policy also provides "[s]taff members who foresee . . . absences must notify a supervisor immediately; notification does not constitute an excusal or approval of the infraction."  (Id. at ECF 2).  Further, "[n]otification of an absence to a staff member's Department Head[] does not automatically mean the absence is authorized.  Any time off from work that is without approval of a staff member's Department Head[] is considered an unscheduled absence."  (Id. at ECF 3).  Plaintiff was aware of this policy.  (Doc. #93-4 at 178).

The decision to terminate plaintiff for her violation of this policy was made by Hirkaler, in consultation with Bon Secours's CEO, Dr. Leahy.  (Doc. #93-22 at 74).  Although Hirkaler notified Wessels of the decision to terminate plaintiff, Wessels played no role in that decision.  (Docs. ##93-13 at Tr. 68; 93-22 at Tr. 74–75).

Plaintiff grieved her termination through her union.  (Doc. #93-4 at 228–32).  Following negotiations with the union, Bon Secours offered plaintiff a "Last Chance Settlement Agreement and Release" (the "Last Chance Agreement")  (Doc. #93-24).  The Last Chance Agreement provided, among other things, that plaintiff could be reinstated to her position under the conditions that plaintiff would be on "final warning status" for six months following her reinstatement, and plaintiff would voluntarily release defendants from any and all actions and claims connected with her employment.  (Id.).  Plaintiff declined to sign the agreement.  (Doc. #93-4 at 233–34).

Plaintiff commenced this action on January 12, 2023.

6

**DISCUSSION**

I. <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 322 (1986).[4]

A fact is material when it "might affect the outcome of the suit under governing law . . . .

Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude

summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material

fact.  <u>Zalaski v. Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its

case on which it has the burden of proof, then summary judgment is appropriate.  <u>Celotex Corp.</u>

<u>v. Catrett</u>, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence,

summary judgment may be granted.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249–50.  The

non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts and may not rely on conclusory allegations or unsubstantiated speculation."

<u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011).  "[T]he mere existence of a scintilla

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it.  Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

II.    FMLA Retaliation

Defendants argue they are entitled to summary judgment on plaintiff's claim for retaliation under the FMLA.

The Court agrees.

A.    Legal Standard

The FMLA allows eligible employees to take up to twelve work weeks of unpaid leave per year for specified purposes, including the birth of a child.  29 U.S.C. § 2612(a)(1)(A).  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" its terms.  Id. at § 2615(a)(1).

A claim for retaliation under the FMLA is governed by the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016).  First, plaintiff bears the burden of making out a prima facie case of retaliation.  Id.  To do so, plaintiff must show (i) she exercised rights protected under the FMLA, (ii) she was qualified for her position, (iii) she suffered an

8

adverse employment action, and (iv) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  Id.  Although plaintiff's burden in making out a prima facie case is de minimis, plaintiff still must adduce some admissible evidence that would support her claim.  See Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006).

If plaintiff makes out a prima facie case of retaliation, the burden shifts to defendants to articulate a legitimate, nonretaliatory reason for their actions.  Graziadio v. Culinary Inst. of Am., 817 F.3d at 429.  If defendants do so, plaintiff must then show that defendants' proffered explanation is pretextual.  Id.  "Ultimately, a plaintiff need only show that FMLA leave was a 'negative factor' in the employer's decision to take an adverse action."  Gordon v. City of New York, 2018 WL 4681615, at *24 (S.D.N.Y. Sep. 28, 2018) (quoting Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 169 (2d Cir. 2017)).

      B.      Prima Facie Case

The dispute in this case centers around the first and fourth elements of plaintiff's prima facie case of retaliation.  Defendants argue plaintiff never exercised rights protected under the FMLA, and even if she did, her termination did not occur under circumstances giving rise to an inference of retaliatory intent.

      1.      Protected Activity

Defendants first argue plaintiff never exercised—or even so much as attempted to exercise—protected rights under the FMLA.  (Doc. #97 at 7).  Plaintiff responds that she attempted to exercise her rights under the FMLA in December 2020, when she informed Wessels of her pregnancy.  (Doc. #98 at 4–5).

"Requests for FMLA leave are protected activity." Stoler v. Inst. for Integrative Nutrition, 2013 WL 6068598, at *10 (S.D.N.Y. Nov. 18, 2013). "Although FMLA regulations do not require an employee to mention the FMLA specifically, they do require an employee to request leave, not just an accommodation." Macropoulos v. Metro. Life Ins. Co., 2018 WL 1508564, at *13 (S.D.N.Y. Mar. 26, 2018).

Here, on December 30, 2020, plaintiff texted Wessels informing her she was "expecting again" and requested to "use 2 hours of my time" to attend a doctor's appointment. (Doc. #93-16). Although plaintiff was not required to expressly invoke the FMLA, the Court nevertheless finds this text message did not amount to a request for FMLA leave. Critically, plaintiff never requested leave nor expressed an intention to take leave—pursuant to the FMLA or otherwise—in connection with the birth of her third child. Thus, plaintiff's text message to Wessels cannot be characterized as an attempt to exercise rights protected under the FMLA.[5]

Further, plaintiff has identified no authority—nor is the Court aware of any—supporting her claim that she engaged in protected activity by merely disclosing her pregnancy to Wessels. To the contrary, ample authority supports defendants' argument that plaintiff did not engage in

---

[5]    The Court notes plaintiff likely engaged in protected activity by requesting and taking FMLA leave in connection with the birth of her second child in August 2019. (Doc. #98-1 at ¶¶ 33, 34). Indeed, the thrust of plaintiff's retaliation claim is that defendants so deeply disliked her use of FMLA leave in 2019 that they terminated her before she could take leave again. (Doc. #98 at 5–6). "The FMLA's protection against retaliation encompasses the employer's conduct both during and after the employee's FMLA leave." Hamilton v. Siemens Healthcare Diagnostics, Inc., 2025 WL 863572, at *15 (S.D.N.Y. Mar. 18, 2025). It would thus be consistent with both plaintiff's position and the FMLA to argue that plaintiff's request for leave in connection with her second pregnancy in 2019 could serve as protected activity for her FMLA retaliation claim. However, plaintiff in no way advances this argument, and "it is not this Court's obligation to make a party's arguments for it." Xiamen ITG Grp. Corp., Ltd. v. Peace Bird Trading Corp., 2025 WL 3460317, at *3 (E.D.N.Y. Sep. 12, 2025). In any event, as detailed below, the outcome would be no different because plaintiff cannot demonstrate defendants' proffered legitimate, nonretaliatory reason for her termination was pretextual.

protected activity by merely informing Wessels she was pregnant.  See Mullin v. Rochester

Manpower, Inc., 204 F. Supp. 2d 556, 562 (W.D.N.Y. 2002) (finding plaintiff had not met her

burden "de minimis as it is, of proving she requested leave and was denied it" by merely telling

her employer she was pregnant); Hewitt v. Triple Point Tech., Inc., 171 F. Supp. 3d 10, 20 (D.

Conn. 2016) (finding plaintiff could not have exercised FMLA rights if she never requested nor

was denied leave); Matthew v. N. Shore-Long Island Jewish Health Sys., Inc., 2013 WL

5799883, at *7 (E.D.N.Y. Oct. 23, 2013) (finding employee did not "prompt a decision on

medical leave" sufficient to make out a prima facie case of FMLA retaliation by merely

disclosing his medical condition to his supervisor).[6]  Thus, plaintiff has failed to show she

exercised rights protected under the FMLA.

2.    Inference of Retaliatory Intent

Plaintiff has also failed to show her termination occurred under circumstances giving rise

to an inference of retaliatory intent.

It is well established that "[p]laintiff cannot show an inference of retaliatory intent when

there is no evidence that the people involved in the termination decision were even aware of the

protected activity against which they allegedly retaliated."  Rotger v. Montefiore Med. Ctr., 2019

WL 1429556, at *13 (S.D.N.Y. Mar. 29, 2019); see also Shah v. Eclipsys Corp., 2010 WL

2710618, at *12 (E.D.N.Y. July 7, 2010).  Here, there is no evidence that the relevant

---

[6]    The Second Circuit has declined to opine as to whether an employee provides adequate notice of their intent to take FMLA leave by merely informing her employer she is pregnant.  See Schultz v. Congregations Shearith Israel of City of New York, 867 F.3d 298, 307 n.3 (2d Cir. 2017); see also Haran v. Orange Bus. Servs., 160 F.4th 51, 59 (2d Cir. 2025) (declining to address whether employee exercised rights protected under the FMLA by telling her employer about a qualified condition but taking paid time off).  The Court is persuaded by the district court decisions cited above that an employee must do more than merely inform her employer she is pregnant.

11

decisionmaker—Hirkaler—had any knowledge of plaintiff's pregnancy or potential future need for FMLA leave.[7]

Plaintiff claims Hirkaler knew about her pregnancy because Hirkaler reviewed text messages between Wessels and plaintiff. (Doc. #98 at 7). But the record does not support plaintiff's claim. First, the text messages between Wessels and plaintiff which Hirkaler testified she reviewed were text messages regarding plaintiff's absence in January 2021, not the December 30, 2020, text message which plaintiff claims constitutes protected activity. (See Docs. ##93-22 at 78–79; 93-17). Further, Hirkaler only remembered reviewing these text messages during the grievance meeting following plaintiff's termination. (Doc. #93-22 at 75–78). In any event, as detailed above, plaintiff's mere mention of her pregnancy was not protected activity under the FMLA. Thus, even if Hirkaler knew plaintiff was pregnant, that would not constitute evidence that Hirkaler knew plaintiff engaged in protected activity.

To be sure, plaintiff has adduced evidence from which a reasonable jury could find Wessels (as distinguished from Hirkaler) harbored retaliatory animus against plaintiff for her use of FMLA leave. (See, e.g., Docs. ##93-4 at 122, 135–36, 260–61; 98-3 at ECF 4–6). But the uncontroverted testimony of both Hirkaler and Wessels shows that, although Hirkaler notified Wessels of the decision to terminate plaintiff, Wessels played no role in that decision. (Docs. ##93-13 at 68; 93-22 at 74–75). Indeed, Hirkaler testified the only other person involved in the

---

[7]    As mentioned above, plaintiff could have argued she engaged in protected activity when she requested FMLA leave in 2019 in connection with her second pregnancy. The record is inconclusive as to whether Hirkaler had any knowledge of plaintiff's requests for FMLA leave in connection with her second pregnancy. Although Hirkaler claims she was not involved in those requests, (Doc. #93-22 at 38, 109), plaintiff claims she overheard Wessels and Hirkaler trying to figure out what leave to which plaintiff was entitled. (Doc. #93-4 at 110–13). Again, however, plaintiff does not advance this argument, and even if she had, the result would be the same because, for the reasons detailed below, plaintiff has produced no evidence from which a reasonable jury could conclude defendants' proffered legitimate, nonretaliatory reason for her termination was pretextual.

decision-making process was Dr. Leahy, Bon Secours's CEO.  (Doc. #93-22 at 74).  In short, "[t]he fact that the relevant decisionmaker was unaware that plaintiff had requested FMLA leave undercuts any argument that retaliatory intent was behind the decision to fire plaintiff."  Shah v. Eclipsys Corp., 2010 WL 2710618, at *12.

The Court is also unpersuaded by plaintiff's argument that temporal proximity supports an inference of retaliation.  (Doc. #98 at 8–9).  In the context of FMLA retaliation claims, "a one-month gap between protected activity and an adverse employment action [is] sufficient to give rise to an inference of retaliatory intent."  Marshall v. Westchester Med. Ctr. Health. Network, 2024 WL 665200, at *6 (S.D.N.Y. Feb 16, 2024) (citing Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002)).

Here, plaintiff argues a reasonable jury could infer retaliatory intent from the short three-week gap between when plaintiff notified Wessels of her pregnancy on December 30, 2020, and when plaintiff was terminated on January 19, 2021.  (Doc. #98 at 8).  But, as detailed above, plaintiff did not engage in protected activity by merely informing Wessels she was pregnant. Thus, the close temporal proximity between plaintiff's December 30, 2020, text message and her termination cannot support an inference of retaliation.[8]

---

[8]    To the extent plaintiff might have argued her use of FMLA leave in connection with her second pregnancy constituted protected activity, she would not have been able to raise an inference of retaliatory intent based on temporal proximity alone.  Reading the record in the light most favorable to plaintiff, she used intermittent FMLA leave in connection with her second pregnancy as late as August 2020.  (Doc. #93-4 at 121–22).  But courts within this circuit "have consistently held that the passage of more than two to three months between the protected activity and the adverse employment action militates against an inference of causation."  Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012); O'Reilly v. Consol. Edison Co. of N.Y., Inc., 173 F. App'x 20, 22 (2d Cir. 2006).  Thus, the gap of more than four months between plaintiff's intermittent leave and her termination in January 2021 cannot give rise to an inference of retaliatory intent.

At bottom, plaintiff has produced no evidence from which a reasonable jury could find her termination occurred under circumstances giving rise to an inference of retaliatory intent. Plaintiff has thus failed as a matter of law to make out a prima facie case of retaliation.

C.    Legitimate Nonretaliatory Reason

Even assuming plaintiff met her de minimis burden of making out a prima facie case—which she did not—defendants have met their burden of proffering a legitimate nonretaliatory reason for plaintiff's termination.  Specifically, defendants maintain plaintiff was terminated because she abandoned her job when she did not report to work for four consecutive days in violation of Bon Secours's attendance policy.  (Doc. #97 at 11).  This suffices to meet defendants' burden at step two of the McDonnell-Douglas burden shifting framework.  See Brown v. The Pension Bds., 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007).

D.    Pretext

Defendants further argue they are entitled to summary judgment because plaintiff cannot show their legitimate nonretaliatory reason for her termination was pretextual.

The Court agrees.

"A plaintiff can prove pretext by 'demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'"  Albertin v. Nathan Littauer Hosp. & Nursing Home, 537 F. Supp. 3d 243, 269 (N.D.N.Y. 2021) (quoting Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013)).

Here, plaintiff argues defendants' proffered reason for her termination is pretextual because it was "unreasonable" for defendants to believe plaintiff had abandoned her position. (Doc. #98 at 10–11).  Specifically, plaintiff claims defendants "were not expecting" her to work from January 12 through January 15, 2021, because she informed Wessels of her absence.  (Id.).

14

Plaintiff relies principally on <u>Graziadio v. Culinary Inst. of Am.</u>, 817 F.3d at 430–31, in which the Second Circuit found an employee demonstrated pretext by showing "it would have been unreasonable for defendants to believe she had abandoned her position." <u>Id</u>. at 430. Indeed, in <u>Graziadio</u>, the <u>only</u> evidence in support of the employer's abandonment theory was that the plaintiff failed to contact a supervisor during her absence. <u>Id</u>. at 430–31.  Further, the plaintiff in <u>Graziadio</u> "did all she could to protect her job," but her employer provided "no response or inconclusive responses." <u>Id</u>. at 431 n.9.

But the undisputed facts in this case stand in stark contrast to those in <u>Graziadio</u>.  Here, plaintiff has identified no evidence to support her claim that defendants "were not expecting" her to report to work that week.  (Doc. #98 at 10).  Plaintiff seizes on Wessels's testimony that she "didn't know" whether she expected plaintiff to come in that week and understood plaintiff "said she couldn't" report to work.  (Doc. #93-13 at 68–69).  At best, this testimony suggests Wessels was not "expecting" plaintiff to report for work in the sense that Wessels was uncertain as to whether plaintiff would in fact report to work.  (<u>Id</u>.).  This testimony in no way suggests Wessels had excused plaintiff's absence.

To the contrary, plaintiff received unambiguous instructions—twice—that she was required to report for work from January 12 through January 15.  (Docs. ##93-4 at 195–96; 93-17 at ECF 8; 93-18).  Indeed, although plaintiff makes much of the fact that defendants did not contact her during her absence, this is not a case in which plaintiff received "no response or inconclusive responses," from her employer, as defendants had clearly rejected plaintiff's request to work remotely.  <u>Graziadio v. Culinary Inst. of Am.</u>, 817 F.3d at 419–20, 431 n.9.  Thus, even reading the record in the light most favorable to plaintiff, the Court cannot say she "did all she

15

could to protect her job" when she ignored those instructions, failed to report for work, and did not contact her supervisor at all during that four-day absence.[9] Id. at 431 n.9.

This is especially true in light of the fact that plaintiff was aware of the hospital's attendance policy, which states,"[f]ailure to call in or report to work for three (3) consecutive days . . . will be considered job abandonment and will be deemed a voluntary resignation." (Docs. ##93-20 at ECF 3; 93-4 at 178).  To the extent plaintiff argues she complied with the hospital's attendance policy because she provided Wessels with advance notice of her absence, that argument is unavailing.  (Doc. #98 at 11).  The attendance policy also provides that "notification does not constitute an excusal or approval of the infraction."  (Doc. #93-20 at ECF 2).  And, again, the record indisputably demonstrates plaintiff's absence was not excused.

Beyond being unable to show defendants' proffered reason for her termination was false, plaintiff also has identified no evidence suggesting FMLA leave was a "negative factor" in defendants' decision. Gordon v. City of New York, 2018 WL 4681615, at *24.  Although plaintiff contends Wessels and other employees harbored retaliatory animus against her for her use of FMLA leave and sought to terminate her before she could take further leave, there is no reason to impute that animus to the decisionmaker Hirkaler. See Shah v. Eclipsys Corp., 2010 WL 2710618, at *12 n.10.  And, for the reasons stated above, the fact that Hirkaler was unaware of plaintiff's potential need for future FMLA leave undercuts any inference of pretext. Id. at *12.

---

[9]    Plaintiff identifies an email she allegedly sent to a human resources employee, Donna Nikaj, on January 11, 2021.  (Doc. #98-3 at ECF 17).  But this email was sent to an incorrect address, and Nikaj did not receive it.  (Doc. #101-1 at 40–41).  In any event, this email cannot suffice to show plaintiff did all she could to protect her job.  The email merely made the same work from home request that had been denied twice previously, and defendants did not receive it.

16

The fact that defendants offered plaintiff the Last Chance Agreement also weighs against an inference of pretext.  If defendants had really intended to retaliate against plaintiff, they would not have been willing to enter into that agreement.  See Hardy v. Rochester Genesee Reg'l Transp. Auth., 906 F. Supp. 2d 178, 187 (W.D.N.Y. 2012) ("The Court also views Defendant's willingness to enter into the Last Chance Agreement as weighing against an inference of pretext, since, if it had really been Defendant's objective to retaliate against Plaintiff, it could have simply terminated him.").[10]

Finally, any inference of pretext is undermined by the fact that defendants granted plaintiff all twelve weeks of FMLA leave to which she was entitled in connection with the birth of her second child.  See Lopez v. Chubb & Son, 2018 WL 4211324, at *7 (D. Conn. Sep. 4, 2018).

At bottom, plaintiff has produced no evidence from which a reasonable jury could conclude defendants' proffered legitimate, nonretaliatory reason for terminating plaintiff was a pretext for retaliation.  Accordingly, even if plaintiff made out a prima facie case of FMLA retaliation, defendants are nevertheless entitled to summary judgment on plaintiff's FMLA retaliation claim.

III.    New York Labor Law § 194

Defendants argue they are entitled to summary judgment on plaintiff's claim for unequal pay under New York Labor Law § 194.

The Court denies defendants' motion for summary judgment as moot.

---

[10]    Plaintiff's citation to Wingfield v. Rochester Sch. For the Deaf, 2013 WL 5475708, at *5 (W.D.N.Y. Sep. 30, 2013), is inapposite.  In that case, the court found an inference of discrimination at the motion to dismiss stage because the plaintiff was told she would be terminated if she refused to sign a last chance agreement containing a waiver of her right to sue. Id.  The opposite happened here.  Plaintiff had already been terminated but was offered reinstatement in exchange for signing the Last Chance Agreement.  (Doc. #93-4 at 232–34).

17

Although neither party raises this issue, the Court has "an independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte." Hunter v. McMahon, 75 F.4th 62, 66 (2d Cir. 2023). A federal court "may decline to exercise supplemental jurisdiction over a [state law] claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Having determined that defendants are entitled to summary judgment on plaintiff's sole remaining federal claim—FMLA retaliation—the Court no longer has original jurisdiction over any claim.[11] As such, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

---

[11]    It is unclear whether the Court could exercise diversity jurisdiction over plaintiff's remaining state law claim. Neither defendants' notice of removal nor plaintiff's first amended complaint sought to invoke the Court's jurisdiction on the basis of diversity of citizenship. (See Docs. ##1; 19 at ¶¶ 2–4). Indeed, the first amended complaint specifically invokes federal question jurisdiction based only on the federal FMLA claims, and alleges the Court has supplemental jurisdiction over the non-federal claims based on 28 U.S.C. § 1367. (Doc. #19 at ¶¶ 2, 3). Although plaintiff alleged she is a citizen of Pennsylvania, and that defendant Bon Secours is a citizen of New York, plaintiff made no allegations whatsoever as to defendant Wessels's citizenship. (Doc. #19 at ¶¶ 5, 8); See St. Paul Fire and Marine Ins. Co. v. Universal Builers Supply, 409 F.3d 73, 80 (2d Cir. 2005) ("Diversity is not complete if any plaintiff is a citizen of the same state as any defendant."). In any event, neither party alleged diversity jurisdiction. See Ukeje v. N.Y.C. Health and Hosp. Corp., 821 F. Supp. 2d 662, 671 (S.D.N.Y. 2011) ("Since the parties have not alleged diversity jurisdiction and [plaintiff's] federal claims are being dismissed, the Court declines to exercise supplemental jurisdiction over [plaintiff's] remaining state law claims.").

18

**CONCLUSION**

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's FMLA retaliation claim is dismissed.  Plaintiff's unequal pay claim under New York Labor Law § 194 remains pending.  Because the Court declines to exercise supplemental jurisdiction over that claim, it may be pursued upon remand to state court, although the Court expresses no opinion about the merits of that claim.

The Clerk is instructed to terminate the motion.  (Doc. #92).

The Clerk is further instructed to remand this case to the Supreme Court of the State of New York, County of Orange, and close this case.

Dated:  June 9, 2026
    White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge

19